UNITED STATES of America, Appellee,

v.

Orazio STANTINI, also known as Ozzie, and Robert Bisaccia, Defendants–Appellants.

Nos. 1159, 1160, Dockets 95–1355, 95–1375.

United States Court of Appeals, Second Circuit.

Argued March 15, 1996.

Decided May 14, 1996.

Alan S. Futerfas, New York City, (Ellen B. Resnick, of Counsel), for Defendant–Appellant Stantini.

David A. Lewis, New York City, The Legal Aid Society, Federal Defender Division, Appeals Bureau, for Defendant–Appellant Bisaccia.

Geoffrey S. Mearns, Brooklyn, NY, Special Assistant United States Attorney for the Eastern District of New York (Zachary W. Carter, United States Attorney for the Eastern District of New York, James Orenstein, Assistant United States Attorney, of Counsel), for Appellee.

Before: FEINBERG, WALKER and PARKER, Circuit Judges.

FEINBERG, Circuit Judge:

Orazio Stantini and Robert Bisaccia appeal their convictions for both conspiracy to murder and murder following a jury trial in the United States District Court for the Eastern District of New York (I. Leo Glasser, J.). Each claims primarily that he did not receive a fair trial because Stantini's trial counsel was laboring under a conflict of interest due to his representation of a defendant being prosecuted for participation in the same murder in the United States District Court for the Southern District of New York at about the same time. For the reasons stated below, we affirm.

## I. Background

In April 1993, Stantini and Bisaccia were indicted and charged with conspiring to murder and murdering Francesco Oliveri in May 1988 for the purpose of maintaining or increasing their position in the Gambino organized crime family (the Gambino family) in violation of 18 U.S.C. §§ 1952B(a)(5) and 1952B(a)(1), respectively.[1] The indictment resulted from the ongoing cooperation with federal authorities of Salvatore Gravano, the alleged underboss of the Gambino family. The indictment identified John Gotti, Gravano, Lorenzo Mannino, John Gambino and Joseph Gambino as unindicted co-conspirators.

At trial and during all of the relevant pretrial proceedings, Stantini was represented by Charles Carnesi and Bisaccia was represented principally by Joel Winograd. The trial took place in November 1993, and the jury found Stantini and Bisaccia guilty of conspiracy as well as the substantive murder charges.

Also pertinent to this appeal is the roughly contemporaneous progress of *United States v. John Gambino*, 88 Cr. 919 (PKL) (S.D.N.Y.) in the Southern District of New York (the Southern District case). The initial indictment in that case, filed over three years before the instant indictment of Stantini and Bisaccia, charged Lorenzo Mannino, John Gambino and Joseph Gambino, among others, with a single narcotics conspiracy. Subsequent superseding indictments added charges of additional racketeering activity. In an eighth superseding indictment returned in August 1992, the Oliveri murder was added as one of 28 predicate acts in a charge of racketeering conspiracy. Counts of conspiracy to murder and the murder of Oliveri were also added. Carnesi, who was Stantini's trial counsel, represented Mannino throughout the entire Southern District proceedings. The first trial in that case began in January 1993 and ended in a mistrial in June 1993, due to a hung jury.

The retrial in the Southern District case was originally scheduled to begin in November 1993, and after postponement (due in part to Carnesi's scheduling conflict with the Stantini trial), began in December 1993. In January 1994, before the trial concluded, Mannino and John and Joseph Gambino pled guilty. Plea negotiations with Mannino had been going on since at least September 1993. In exchange for a recommendation of a 15–year sentence, Mannino pled guilty to the racketeering conspiracy and admitted, among other things, his participation in the Oliveri murder. Mannino's plea agreement contained a provision that his plea allocution could not be used as evidence in any other criminal trial.

At the trial of Stantini and Bisaccia in the Eastern District, the bulk of the government's evidence was Gravano's testimony regarding the motivation for, as well as the planning and implementation of, the murder. Gravano testified that the murder was retaliation against Oliveri for his involvement in

---

1. In November 1988, § 1952B was renumbered as § 1959. See Pub.L. No. 100–690, § 7053(b), 102 Stat. 4181, 4402 (1988). Because the murder took place in May 1988, Stantini and Bisaccia were charged under the statute as previously numbered.

the murder of Giuseppe Gambino, a member of John Gambino's "crew." John Gotti, the alleged boss of the Gambino family, approved the murder of Oliveri and put Gravano in charge of supervising it. The team was made up of Gravano, Joseph Gambino, Mannino, Bisaccia (brought in at the suggestion of Gotti and designated by him as the shooter) and Stantini (brought in at the suggestion of Gravano). After a dry run to reconnoiter the area, a date for an attempt was set. The night before this attempt, all of the participants met at the Ravenite Social Club in Manhattan to go over the details of the plan. Mannino and Joseph Gambino were responsible for securing guns and walkie-talkies as well as stolen and legitimate cars for use in the murder. The attempt went ahead as planned, but the team arrived too late to confront Oliveri outside his apartment building. The participants agreed to try again one week later. The night before the second attempt Gravano, Joseph Gambino and Bisaccia met at the Ravenite Club and briefly discussed the murder preparations.

Gravano testified that on the day of the murder he and Mannino arrived at the scene in one car and Bisaccia, Joseph Gambino and Stantini were in another car. Stantini's role was the back-up shooter. After Oliveri was spotted outside his building, Bisaccia approached Oliveri and shot him a number of times. The participants then fled the scene.

Gravano testified that after their participation in the Oliveri murder, Stantini became a "made" member of the Gambino family and Bisaccia became a "captain" of the New Jersey faction of the family.

Gravano's testimony was corroborated primarily by (1) a videotape of a meeting of the entire murder team on April 25, 1988, the night before the failed attempt, outside the Ravenite Club; (2) a videotape of Gotti, Gravano, Joseph Gambino and Bisaccia outside the Ravenite Club on May 2, 1988, the night before the murder; (3) audiotapes containing a conversation between Joseph Gambino and Mannino in which they discussed plans for obtaining cars to be used in the murder; and (4) phone records of Mannino's car phone indicating a call to Safe Auto Sales just prior

to when the intercepted conversation noted above took place.

Gravano also testified that when he was initially debriefed by federal agents in November 1991 regarding the Oliveri murder, he had forgotten Stantini's involvement and made no mention of him. At some point in 1992, he received a call from FBI Special Agent Thomas Petrouskie who was investigating the murder. Petrouskie asked Gravano if Stantini had been involved in the murder. Gravano immediately remembered that Stantini had taken part in both the planning and the execution of the murder. Thereafter, Gravano called John Gleeson of the United States Attorney's Office and informed him that Stantini was involved.

As already indicated, Stantini and Bisaccia were found guilty in November 1993 in the Eastern District trial presided over by Judge Glasser. In April 1994 Stantini, now represented by Alan S. Futerfas, moved for a new trial based on Fed.R.Crim.P. 33 and 18 U.S.C. § 2255. Stantini claimed that his Sixth Amendment right to counsel had been violated because Carnesi's simultaneous representation of Mannino in the Southern District case created an actual conflict of interest that adversely affected Carnesi's representation of Stantini in the Eastern District trial with respect to both plea negotiations and the defense strategy selected at trial. Bisaccia, still represented by Winograd, joined Stantini's new trial motion claiming that Carnesi's conflict of interest "severely prejudiced" Bisaccia.

Following oral argument, but without holding an evidentiary hearing, Judge Glasser denied the motion. The judge ruled that (1) insofar as the motion sought relief under Criminal Rule 33, it was untimely; and (2) insofar as the motion sought relief under § 2255, "[t]he submissions in support of [the motion] are facially insufficient" and therefore "a hearing is not warranted." In support of the latter conclusion, the judge held that Stantini did not establish that, with respect to plea negotiations, Carnesi was laboring under an actual conflict of interest and that Carnesi's alleged concerns about the effect of a Stantini guilty plea on Mannino in the Southern District case were realistic.

Further, Stantini had failed to demonstrate that a plausible alternative defense strategy or tactic had not been pursued at trial because of Carnesi's representation of Mannino. Finally, Bisaccia's joinder of Stantini's motion was "patently frivolous."

Stantini and Bisaccia were both sentenced in June 1995. Primarily, Stantini was sentenced to 324 months in prison and Bisaccia to life in prison. This appeal followed.

## II. Discussion

On appeal, Stantini again claims that Carnesi's concurrent representation resulted in an actual conflict of interest that adversely affected his representation. He further claims that the district court improperly ruled on this issue without an evidentiary hearing. In addition, Stantini claims for the first time that automatic reversal of his conviction is required because the district court should have been aware of Carnesi's conflicting interests and failed to inquire into them. Bisaccia claims that Carnesi's conflict and the district court's failure to inquire into it prejudiced him to an extent that requires a reversal as well. Furthermore, he argues that his trial counsel's failure to address affirmatively Carnesi's conflict and the adoption of a joint defense strategy with Carnesi resulted in ineffective assistance of counsel. Finally, both argue that the jury instruction given at trial on the elements of the murder conspiracy charge was legally insufficient.

### A. Conflict of Interest

#### 1. The Government's Role

As an initial matter, the government stated in its affidavit filed in opposition to Stantini's motion for a new trial in the district court that it was aware of Carnesi's dual representation of Mannino and Stantini from the time of Stantini's arraignment. The central issue in this appeal could thus have been easily

**2.** We express no opinion on whether *Curcio* would have required obtaining such a waiver under the circumstances of this case.

**3.** In at least three recent cases where a potential conflict of interest of a defense attorney was an issue in a federal trial, we have noted the government's failure or delay in bringing the potential conflict to the attention of the trial judge. See

disposed of prior to trial had the government brought this fact to Judge Glasser's attention. The judge at that time could have conducted an inquiry and, if it was required, taken further action. Thus, if it was appropriate to do so, he could have obtained on the record Stantini's waiver of conflict-free counsel under the procedures outlined in *United States v. Curcio*, 680 F.2d 881, 888–90 (2d Cir.1982).[2] Convictions are placed in jeopardy and scarce judicial resources are wasted when possible conflicts are not addressed as early as possible. We therefore reiterate our admonition to the government in earlier cases to bring potential conflicts to the attention of trial judges.[3]

#### 2. The Trial Court's Obligation to Inquire About a Conflict of Interest

■ The trial court has an obligation to inquire into the facts and circumstances of an attorney's interests either in response to a timely conflict of interest objection, *Holloway v. Arkansas*, 435 U.S. 475, 488, 98 S.Ct. 1173, 1180–81, 55 L.Ed.2d 426 (1978), or "when it knows or reasonably should know of the possibility of a conflict of interest." *Strouse v. Leonardo*, 928 F.2d 548, 555 (2d Cir.1991); see also *Levy*, 25 F.3d at 153. Failure to engage in such an inquiry, when it is required, results in an automatic reversal. *Wood v. Georgia*, 450 U.S. 261, 272 n. 18, 101 S.Ct. 1097, 1103–04 n. 18, 67 L.Ed.2d 220 (1981); *Levy*, 25 F.3d at 153–54. An inquiry allows the trial judge to determine the precise nature of the conflict and how to proceed, i.e. whether to disqualify counsel, obtain a waiver from the defendant pursuant to *Curcio*, or take no action. See *Malpiedi*, 62 F.3d at 468 n. 2.

Stantini argues that Judge Glasser's inquiry obligation attached no later than when Agent Petrouskie testified on the day before the trial ended. On redirect examination,

*United States v. Malpiedi*, 62 F.3d 465, 467 (2d Cir.1995); *Ciak v. United States*, 59 F.3d 296, 306 n. 8 (2d Cir.1995); *United States v. Iorizzo*, 786 F.2d 52, 59 (2d Cir.1986). Cf. *United States v. Levy*, 25 F.3d 146, 152 (2d Cir.1994) (although government brought potential conflict to attention of original trial judge, it failed to do so to judge to whom the case was transferred).

Petrouskie testified about a pre-trial meeting in the United States Attorney's Office in the Southern District case with one Jerry Farrell, a witness to the scene of the Oliveri murder. Petrouskie testified that Carnesi was present at that meeting, during which Farrell stated that he had lied to Agent Petrouskie when he told him during a prior interview that he saw two men standing over the dead body and had identified those two men as Gravano and Mannino. At that point, Carnesi approached the bench and informed Judge Glasser that he had a "big problem" with Agent Petrouskie mentioning his name in connection with the Southern District case. Carnesi confirmed that he was at the meeting, but recalled Farrell saying that he did not remember anything about the murder or about any statements or interviews with law enforcement officials.

According to Stantini, given that Judge Glasser was aware from pre-trial conferences in the instant case that Carnesi was also involved in the Southern District case, Carnesi's "problem" with Agent Petrouskie's testimony should have alerted the Judge to the possibility of a conflict of interest. The "problem" included the fact that Carnesi was a potential witness to what Farrell did or did not say at the meeting and therefore may not have been able to fully cross-examine Agent Petrouskie on this point.

Judge Glasser's failure to make a timely inquiry into Carnesi's potential conflict of interest was not raised in the motion for a new trial in the district court, and has been raised by both Stantini and Bisaccia for the first time on appeal. We therefore review it as a matter of plain error. See *United States v. Yu–Leung,* 51 F.3d 1116, 1121 (2d Cir.1995).

Up to the moment of Agent Petrouskie's testimony, no one had informed Judge Glasser, either informally or in the form of an objection, of Carnesi's concurrent represen-

tation of Stantini and Mannino or of any problems that might stem from it. Indeed, neither Stantini nor Bisaccia argues that Judge Glasser actually knew about the "conflict" until the motion for a new trial. They argue only that the judge should have been aware of the potential conflict and therefore should have conducted an inquiry.

We note initially that the exchange between Judge Glasser and Carnesi regarding Agent Petrouskie's testimony took place toward the end of a busy trial and during testimony that was not clearly relevant to this case. Under these circumstances and on the record before us, the most that Judge Glasser could reasonably be charged with knowing was that Carnesi represented another defendant in the Southern District case and that in some way the Oliveri murder was an issue in that case, although not necessarily even part of the indictment. At that point in the trial it was not clear that Farrell had at one time identified Mannino as being present at the scene of the murder.[4] Even more important, there was no indication that Carnesi was representing Mannino in the Gambino case or at the Farrell meeting. The only issues raised by Carnesi were the mention of his presence at the meeting and his possible inability to cross-examine Agent Petrouskie about what had transpired. These were issues that, given how far afield the questioning of Petrouskie had gone, Judge Glasser apparently and reasonably felt were irrelevant. Also, Farrell had not testified, but Judge Glasser was made aware of the defense's efforts to get him to do so.[5]

■ Dual representation in separate but related proceedings, without more, does not trigger the inquiry obligation.[6] There must be, in addition, a reasonable awareness of a potential conflict of interest. In *Ciak,* the case on which Stantini primarily relies, the defendant was charged with possession of two guns that were found under the seat of a

---

**4.** Agent Petrouskie's testimony as to that came later, as did his clarification of what it was that Farrell had allegedly lied about.

**5.** Farrell did not testify at either the instant trial or the Southern District case.

**6.** This is not the rule for dual representation in the same proceeding. Fed.R.Crim.P. 44(c) requires an inquiry whenever there is joint representation of defendants that have been jointly charged or joined for trial. Rule 44(c) does not apply to the representation of two defendants in two different forums. See *United States v. Aiello,* 814 F.2d 109, 112–13 (2d Cir.1987).

car that he was driving. 59 F.3d at 298–99. The defense presented at trial, supported by a witness, was that the guns were placed in the car by the defendant's sister and her then-fiance Reed. *Id.* at 299. Attorney Wieselman represented the defendant at trial but also represented the sister and Reed (who were the joint owners of the car) in their ultimately successful effort to prevent forfeiture of the car under state law. *Id.* Reed was called by the government as a rebuttal witness to the claim that the guns were placed in the car by the defendant's sister. *Id.* At this point the sister and Reed had broken up and he had apparently made off with the car. *Id.* Wieselman, who was depending on the sale of the car to pay for his fee in representing the defendant, spent "fully sixteen pages of the trial transcript" aggressively questioning Reed in an attempt to get him to disclose the location of the car. *Id.* During this testimony it was disclosed that Wieselman represented Reed and the defendant's sister during the forfeiture proceedings. *Id.* at 300. The trial judge failed to inquire any further into the circumstances of the dual representation. *Id.*

This court reversed the defendant's conviction and remanded for a new trial. We determined that the judge had a duty to inquire into Wieselman's interests because he should have been aware of two potential conflicts. First, during Reed's testimony Wieselman became an unsworn witness to prior statements by Reed, statements made during the course of representing him in the forfeiture proceeding. *Id.* at 304–05. This in and of itself can form a suitable basis for the attorney's disqualification. See *Iorizzo*, 786 F.2d at 57; *United States v. McKeon*, 738 F.2d 26, 34–35 (2d Cir.1984). Second, the trial judge was aware of Wieselman's joint representation of defendant at trial and of Reed and the defendant's sister in the forfeiture proceeding. Along with this the judge knew that the defense theory at trial was that the guns belonged to Reed and the sister. It was obvious that this defense was directly in conflict with the position that Wieselman would have had to advocate in the forfeiture proceeding. *Ciak*, 59 F.3d at 305–06.

This case differs significantly from *Ciak* with respect to both potential conflicts. Carnesi was not a potential unsworn witness to something a former client had said; at most, he was a possible witness to a prior statement by a possible witness who did not even testify in either proceeding. Second, even if Judge Glasser should have known that Carnesi was representing an unidentified person in the Southern District case, it was not reasonably apparent how that knowledge would indicate any obvious divergence of interest with respect to defense strategies, much less the diametrically opposed positions that the attorney had to take in *Ciak*.

Under the circumstances, Judge Glasser's failure to hold an inquiry was not clear error. See *Cuyler v. Sullivan*, 446 U.S. 335, 346–48, 100 S.Ct. 1708, 1717–18, 64 L.Ed.2d 333 (1980) (multiple representation at separate trials where there appeared to be no conflicting defense strategies did not give rise to duty to inquire); *Aiello*, 814 F.2d at 113 (no duty to inquire attached when trial judge was aware of dual representation in separate proceedings and there was no indication of divergent interests or defenses). The failure of Stantini's new counsel to argue to Judge Glasser in the motion for a new trial that the judge had not fulfilled his inquiry obligation further persuades us that any error by the district judge to fail to recognize that obligation in the last day or two of a busy trial was not so obvious as to constitute plain error.

3. The Alleged Conflict Problems, Apart from the Duty to Inquire

a. The Legal Standard

A claim that counsel is conflicted is in essence a claim of ineffective assistance of counsel. *Glasser v. United States*, 315 U.S. 60, 70, 62 S.Ct. 457, 464–65, 86 L.Ed. 680 (1942). Generally, a defendant who claims ineffective assistance must show prejudice to prevail. *Strickland v. Washington*, 466 U.S. 668, 687, 104 S.Ct. 2052, 2064, 80 L.Ed.2d 674 (1984). However, when counsel is burdened with an actual, as opposed to a potential, conflict of interest, a "fairly rigid" presumption of prejudice applies. *Id.* at 692, 104 S.Ct. at 2067. Nevertheless, "[p]rejudice is

presumed only if the defendant demonstrates that counsel 'actively represented conflicting interests' and that 'an actual conflict of interest adversely affected his lawyer's performance.'" *Id.* (quoting *Cuyler*, 446 U.S. at 348, 350, 100 S.Ct. at 1718, 1719). "In the multiple representation context, an attorney has an actual, as opposed to a potential, conflict of interest when 'during the course of the representation, the defendants' interests ... diverge with respect to a material factual or legal issue or to a course of action.'" *United States v. Fulton*, 5 F.3d 605, 609 (2d Cir.1993) (quoting *Cuyler*, 446 U.S. at 356 n. 3, 100 S.Ct. at 1722 n. 3). Once a defendant has established that there is an actual conflict, he must show that "'a lapse of representation' ... resulted from the conflict." *Iorizzo*, 786 F.2d at 58 (quoting *Cuyler*, 446 U.S. at 349, 100 S.Ct. at 1718–19). To prove a lapse of representation, a defendant must "demonstrate that some plausible alternative defense strategy or tactic might have been pursued" but was not and that "the alternative defense was inherently in conflict with or not undertaken due to the attorney's other loyalties or interests." *Winkler v. Keane*, 7 F.3d 304, 309 (2d Cir.1993) (quoting and adopting the test of *United States v. Gambino*, 864 F.2d 1064, 1071 (3d Cir.1988), *cert. denied*, 492 U.S. 906, 109 S.Ct. 3215, 106 L.Ed.2d 566 (1989)), *cert. denied*, — U.S. —, 114 S.Ct. 1407, 128 L.Ed.2d 79 (1994).

■ Finally, "[w]hether a defendant's representation was constitutionally inadequate is a mixed question of law and fact and thus we exercise *de novo* review." *Winkler*, 7 F.3d at 308. See also *Cuyler*, 446 U.S. at 342, 100 S.Ct. at 1714–15.

Stantini claims that an actual conflict of interest resulted from Carnesi's dual representation of Stantini and Mannino, and that a lapse in representation resulted from this conflict in the context of both plea negotiations and the defense strategy adopted by Carnesi at trial. He argues that the district court ruled incorrectly on both of these claims, and did so improperly without the benefit of an evidentiary hearing.

### b. Plea Negotiations

In response to a request by Bisaccia's trial counsel during jury selection, the government offered to accept a guilty plea for the murder conspiracy charge, which carried a maximum ten-year sentence, in satisfaction of the pending charges. The offer was conditioned, however, on acceptance by both Bisaccia and Stantini. Bisaccia was interested in a plea, but Stantini's counsel (Carnesi) told the government that Stantini had rejected the plea offer, and that Stantini was not interested in pleading guilty "under any circumstances."

In Stantini's motion for a new trial, his new counsel (Futerfas) submitted an affidavit along with his reply brief. Futerfas's affidavit stated:

> If called to testify at a hearing, Mr. Carnesi would say that he felt somewhat relieved by Mr. Stantini's initial negative reaction to the plea offer. Mr. Carnesi would say that the reason for such "relief" was his concern about the impact such a plea would have on Lorenzo Mannino. Mr. Carnesi would say he was concerned about publicity adverse to Lorenzo Mannino, and concerned about Lorenzo Mannino's reaction to the plea. Finally, Mr. Carnesi was concerned that, despite best efforts during jury selection, jurors could be picked who were aware that Orazio Stantini had plead guilty to the same crime.

Stantini argues that Carnesi's admission demonstrates that he did not fully represent Stantini's interests in plea negotiations because of his fears of the effect a Stantini guilty plea would have on Mannino in the Southern District case.

■ The Futerfas affidavit was conspicuously silent in several respects: It offered Judge Glasser no assertion that (1) Carnesi did not make the statement to the government that Stantini was not interested in pleading guilty, (2) Carnesi misrepresented Stantini's position when he informed the government that Stantini was not interested in pleading guilty under any circumstances, (3) Carnesi in any way counseled Stantini inadequately with respect to the advantages or disadvantages of a plea or (4) Stantini was, or could have been, interested in accepting a

plea under any set of circumstances. Either Stantini or Carnesi, or both, were in a position to make these assertions if they were true, but they failed to do so. Therefore, putting aside the issue of whether Carnesi labored under an actual conflict of interest, Stantini has not shown any lapse in representation. Although in theory pleading guilty was a plausible defense strategy that was not undertaken, Stantini has offered no evidence whatsoever that this strategy was not undertaken for any reason other than his own desire not to so plead. He has not indicated that there is any evidence that the strategy was forgone because of any conflicting interest of Carnesi. This is so regardless of what Carnesi's personal reaction may have been to Stantini's own position.

Likewise, regardless of Carnesi's articulated concerns, there was nothing about a Stantini guilty plea that was "inherently in conflict with" Carnesi's representation of Mannino. As he did in connection with Mannino's guilty plea in the Southern District case, Carnesi could have insisted that any Stantini plea include a provision that the government could not use the plea as evidence in another trial. Careful jury selection procedures would have insured that jurors in the subsequent Mannino trial would not be aware that a co-conspirator had pled guilty to the murder.

In *Winkler*, a claim was made that trial counsel in defendant's state court murder trial failed to initiate or engage in plea discussions because counsel stood to obtain a significantly higher fee if the defendant was acquitted. 7 F.3d at 307–08. This court, in review of the district court's denial of the defendant's habeas corpus petition, relied on the state habeas court's findings that defendant advised trial counsel that he was innocent and was not interested in pleading guilty. *Id.* at 309. Although we determined that pursuit of plea negotiations was a plausible defense strategy, we deferred to the state court's determination that "trial counsel did not pursue a plea bargain because Winkler rejected this path, not because of trial counsel's [conflicting interests]." *Id.* Given the paucity of Stantini's papers in the district

court on the similar issue before us, we see no reason not to reach the same result here.

With regard to Stantini's claim that the district court should have held an evidentiary hearing on this issue, the standard for sufficiency of a pleading in order to obtain an evidentiary hearing on a motion for a new trial is well known. See *Dalli v. United States*, 491 F.2d 758, 760–61 (2d Cir.1974). "Not every application that is supported by a set of facially meritorious allegations will survive a motion to deny the [application]. To warrant plenary presentation of evidence, the application must contain assertions of fact that a petitioner is in a position to establish by competent evidence." *Aiello*, 814 F.2d at 113. "Whether there is a genuine issue of material fact depends upon the sufficiency of those factual allegations. Airy generalities, conclusory assertions and hearsay statements will not suffice because none of these would be admissible evidence at a hearing." *Id.* at 113–14.

■ The gist of Stantini's position on this phase of the case is that Carnesi did not pursue plea negotiations on his behalf because Carnesi was concerned about the effect a Stantini guilty plea would have on Mannino in the Southern District case. But, as stated above, on the motion for a new trial Stantini offered Judge Glasser no evidence that he had been the slightest bit interested in a guilty plea, although he obviously could have done so if it were so. Judge Glasser had before him the affidavit of the Assistant United States Attorney trying the case, which stated that Carnesi had said that Stantini was not interested in pleading guilty "under any circumstances." On the basis of the record before it, the district court did not abuse its discretion by refusing to grant an evidentiary hearing. See *Newfield v. United States*, 565 F.2d 203, 207 (2d Cir.1977) (unless § 2255 motion is supported by sufficient affidavit, the decision whether to hold evidentiary hearing is left to the discretion of the district court).

#### c. Trial Strategy

Stantini next claims that Carnesi refused to adopt any argument or defense strategy at trial that would be inconsistent with Manni-

no's innocence. In other words, Carnesi avoided any argument that emphasized the evidence of Mannino's participation in the murder. To this end, Carnesi argued that Gravano's entire story was a fabrication, including the account of Mannino's role. This argument required, according to Stantini, unnecessary refutation of all of the substantial corroborating evidence supporting Gravano's testimony, including the independent evidence regarding Mannino.

By pursuing such a defense strategy, the argument continues, Carnesi did not use a number of arguments that would have been more closely tailored to Stantini's position. For instance, Carnesi could have focused on impeaching Gravano's testimony only regarding Stantini's participation and the lack of independent corroboration of Stantini's involvement. Carnesi could have made better use of the evidence regarding Farrell, had he not been so concerned with Farrell's identification of Mannino at the scene, by arguing that Gravano's testimony was designed to reduce his own role in the murder. Stantini further contends in his brief that "[u]nburdened counsel could then have argued that if Gravano was willing to put himself in the car when, in fact, he actually shot Oliveri, then Gravano would be willing to put Mr. Stantini at the scene when he knew that Mr. Stantini was not there." Finally, Carnesi could have conceded that the subject of the April 25, 1988 meeting portrayed on videotape was the murder preparations, but argued that Stantini later pulled out of the plan. This could also have explained why Gravano did not remember Stantini's involvement, because he was not involved in the actual murder.

These arguments regarding defense strategy allegedly forgone are not persuasive. To a large extent Carnesi actually pursued the defense strategy that Stantini argues Carnesi ignored because of his loyalty to Mannino. Carnesi argued vigorously that Gravano fabricated Stantini's involvement in the Oliveri murder, after being invited to do so by Agent Petrouskie, in order to secure another conviction. Carnesi highlighted the lack of cor-

roboration of Stantini's involvement, and introduced evidence that the subject of the April 25, 1988 meeting captured on videotape (arguably the only piece of corroborating evidence of Stantini's participation) was not the Oliveri murder, but construction projects in which the participants of the meeting had an interest.[7] Carnesi subpoenaed Farrell and even though Farrell did not testify, Carnesi managed to get Farrell's identification of Gravano standing over the victim's body before the jury, even though Farrell apparently later recanted that statement. Carnesi's summation asked the jury to compare Farrell's statement with Gravano's account of his own participation.

Stantini's claim is, at bottom, that his interests and Carnesi's (and by extension Mannino's) diverged with respect to any concession of Mannino's participation in the murder, and that Carnesi declined to make such a concession at trial because of his conflicting loyalty to Mannino. We disagree on both counts.

To demonstrate a divergence of interests, Stantini must show that he had an interest in highlighting Mannino's participation in the murder or in placing Mannino at the scene. But it is not apparent how Stantini's case would have been materially advanced had Carnesi highlighted or conceded Mannino's guilt. See *United States v. McCaskey*, 9 F.3d 368, 381 (5th Cir.1993) ("An actual conflict of interest exists whenever one defendant stands to gain significantly by advancing plausible arguments that are damaging to the cause of a co-defendant whom counsel is also representing."), *cert. denied*, —— U.S. ——, 114 S.Ct. 1565, 128 L.Ed.2d 211 (1994). A concession as to the participation of any of the other co-conspirators would have served to support Gravano's account of the murder. Nothing in that account or any of the other evidence presented suggested that if Mannino participated in the murder (or specifically if he was identified at the scene of the crime)

---

7. We do not see how it would have been in Stantini's interest to admit that the April 25    meeting concerned the murder.

then Stantini did not participate or that his level of culpability was any less.[8]

Moreover, there is no evidence that the concession of Mannino's guilt in Stantini's trial was forgone because of Carnesi's allegedly conflicted position. Stantini concedes in his reply brief in this court that "[t]he only evidence in the record regarding Mr. Carnesi's trial strategy is counsel's assertion [in Futerfas's affidavit in the district court]." That assertion was "that an attorney who pursues a defense that concedes the guilt of another client who has yet to stand trial for the same crime would logically place a strain on counsel's relationship with the client so affected." Neither Stantini nor Carnesi has alleged any facts regarding the selection of defense strategy at trial. There is no persuasive indication in the record before us that the refusal to concede the guilt of Mannino was necessitated by anything other than a determination as to the best possible defense to put on.

Stantini did not allege in the district court—and does not do so even now—that he requested Carnesi to pursue such a strategy or that he would have approved such a strategy had Carnesi suggested it. Cf. *Aiello*, 814 F.2d at 111, 114 (evidentiary hearing necessary when defendants asserted in their affidavits in the district court that they asked their defense counsel to call a particular witness and he refused to do so); *Ciak*, 59 F.3d at 301, 307 (evidentiary hearing necessary when witness who defense counsel refused to call submitted an affidavit of willingness to appear and present exculpatory testimony). Stantini has not asserted that he was in a position to prove anything regarding the selection of defense strategy other than what the record already reflects. Under the circumstances, the district court did not err in denying an evidentiary hearing.

### 4. Bisaccia's Claim of Direct Prejudice

Bisaccia argues on appeal, as he did in the district court by joining Stantini's new trial motion, that he is entitled to a new trial because he was directly prejudiced by Carnesi's conflict of interest. He claims that Carnesi did not seriously explore a guilty plea for Stantini due to Carnesi's conflict of interest and points out that the government conditioned any plea agreement on the acceptance by both defendants. From this, Bisaccia argues that he would have been able to take advantage of a guilty plea had Stantini been represented by unconflicted counsel. Bisaccia also contends that he was prejudiced by the adoption of a joint defense strategy that refused to emphasize Mannino's guilt and that had his best defense been put forward, the outcome of the trial would have been different.

Bisaccia's basic proposition is that if counsel for co-defendant A is burdened with an actual conflict of interest, co-defendant B can take advantage of this and obtain a new trial. However, there is no reason for us to consider the validity of this theory, which Bisaccia's appellate counsel conceded was "somewhat novel." We have determined that Stantini suffered no lapse of representation in plea negotiations from any conflict that Carnesi may have been laboring under, and that there was no divergence of interest between Stantini and Mannino with respect to trial strategy. Under the circumstances, Carnesi's conduct, regardless of any alleged conflict, could not have prejudicially affected Bisaccia.

### 5. Bisaccia's Claim of Ineffectiveness of Counsel

Bisaccia also argues that his trial counsel, Winograd, rendered constitutionally defective assistance of counsel. This ineffectiveness claim is governed by the familiar standard set out by the Supreme Court in *Strickland*. In order to prove a constitutional violation a defendant must show that (1) "counsel's representation fell below an objective standard of reasonableness," 466 U.S. at 688, 104 S.Ct. at 2064, and (2) the deficient performance

---

**8.** A conflict of interest can develop when counsel represents two defendants and the available evidence points to significantly different levels of culpability in the crimes charged. See *Levy*, 25 F.3d at 156; *Camera v. Fogg*, 658 F.2d 80, 87 (2d Cir.), *cert. denied*, 454 U.S. 1129, 102 S.Ct. 981, 71 L.Ed.2d 117 (1981); *Fitzpatrick v. McCormick*, 869 F.2d 1247, 1252 (9th Cir.), *cert. denied*, 493 U.S. 872, 110 S.Ct. 203, 107 L.Ed.2d 156 (1989). But that is not the case here.

prejudiced the defense. *Id.* at 687, 104 S.Ct. at 2064.

Bisaccia argues that Winograd's failure to recognize the conflict that Carnesi was laboring under, his failure to bring the conflict to the attention of the district court or affirmatively seek Carnesi's disqualification, and his decision to adopt a joint defense strategy that catered to Carnesi's conflicted interests all clearly fell below minimum standards of reasonable representation. Further, essentially repeating his prejudice argument, Bisaccia asserts that had Winograd not made these unreasonable mistakes, it was reasonably probable that the outcome of plea negotiations or the trial would have been different. Bisaccia also argues that because his ineffectiveness claim is plausible and would benefit from further factual development, the case should be remanded to the district court for an evidentiary hearing.

■ Although Bisaccia's ineffectiveness claim is raised for the first time on direct appeal rather than in the district court, this court can decide the issue when "its resolution is 'beyond any doubt' or to do so would be in the interest of justice." *United States v. Matos,* 905 F.2d 30, 32 (2d Cir.1990) (quoting *United States v. Aulet,* 618 F.2d 182, 186 (2d Cir.1980).

■■■ Bisaccia has failed to demonstrate any deficient performance on Winograd's part. There was virtually no reason to think that the dual representation would give rise to a conflict of interest that would in any way affect Bisaccia's case. Under these circumstances, Winograd's failure to move for Carnesi's disqualification or to bring the possible conflict to Judge Glasser's attention was not objectively unreasonable.

Moreover, there was no deficiency with respect to Winograd's performance in plea negotiations or at trial. He had no control over the government's demand that both defendants agree to plead guilty or over Stantini's reaction to the plea offer. Moreover, it was not unreasonable to adopt the trial strategy that Winograd did. Winograd attempted to impeach Gravano's credibility by calling attention to his criminal past, his exhortations to associates to lie when testifying un-

der oath, and the benefits that Gravano stood to gain by helping convict other members of the Gambino family. He argued that the corroborating evidence against Bisaccia had no relationship to the murder. Most significantly, to the extent that Bisaccia now argues that Winograd adopted a defense strategy that refused to throw light on Mannino's guilt, Winograd brought out on cross-examination of Agent Petrouskie that Farrell had identified Mannino (rather than Bisaccia) as standing over the body at the scene. He also highlighted corroborating evidence against Mannino in his summation.

Because Bisaccia has failed to raise a plausible ineffectiveness claim, there is no need for further factual development in the district court. See *United States v. Tarricone,* 996 F.2d 1414, 1417–18 (2d Cir.1993).

### B. Jury Instruction on Conspiracy

■■ Both Stantini and Bisaccia argue that the district court improperly failed to instruct the jury that it must find that each defendant had in mind the objective alleged in the indictment, namely to maintain or increase his position in the Gambino family by committing the Oliveri murder, in order to hold the particular defendant guilty of the charged conspiracy. As the charge was not objected to at trial, Stantini and Bisaccia must persuade us that the charge as given was plain error.

We find no error in the charge. Judge Glasser instructed the jury that "the government must prove beyond a reasonable doubt ... that a conspiracy existed, that is, that two or more persons, one of whom being the defendant you are considering, agreed to commit a crime, agreed to violate the federal law against murder, *for the purpose of maintaining or enhancing a position in an enterprise engaged in racketeering activity*" (emphasis added). Appellants concede that this instruction covered all of the essential elements of the conspiracy charge. They maintain, however, that the instruction was contained merely in a "brief summary" at the end of the instructions on the conspiracy charge, and that it left the jury confused as to the relationship between the summary and the "main" portion of the instructions, which

outlined each element of the crime but did not refer to improving or enhancing a defendant's position in the racketeering organization.

Appellants' claim essentially is that Judge Glasser did not use a sufficient number of words in giving the allegedly overlooked instruction and that the judge did not use the words early enough in the charge. However, viewing the charge as a whole, as we must, *United States v. Reese,* 33 F.3d 166, 172 (2d Cir.1994), *cert. denied,* —— U.S. ——, 115 S.Ct. 756, 130 L.Ed.2d 655 (1995), we conclude that the jury was given a legally correct instruction. See *United States v. Imran,* 964 F.2d 1313, 1317 (2d Cir.) (defendant only entitled to legally correct charge, not any particular wording), *cert. denied,* 506 U.S. 1009, 113 S.Ct. 626, 121 L.Ed.2d 558 (1992). Appellants' reliance on *United States v. Gallerani,* 68 F.3d 611 (2d Cir.1995) is misplaced because in that case the trial judge made *no* mention in the jury charge of the objects of the conspiracy alleged in the indictment. *Id.* at 618.

We affirm the judgments of conviction.