VICTOR MARRERO, United States District Judge
Petitioner Hector Raymond Pena ("Pena") filed a motion pursuant to 28 U.S.C. Section 2255 (" Section 2255") to vacate, set aside, or otherwise correct his conviction and sentence. ("Motion," Dkt. No. 1.)[1] Pena is currently serving a sentence of life imprisonment after a jury found him guilty of three counts of murder for hire in violation of 18 U.S.C. Section 1958, two counts of conspiracy to commit murder for hire in violation of 18 U.S.C. Section 1958, and three counts of murder *177 through use of a firearm during a crime of violence in violation of 18 U.S.C. Section 924 (j).
In the Motion, Pena argued that: (1) he was denied his Sixth Amendment right to the effective assistance of counsel; (2) the court lacked jurisdiction to impose his sentence; and (3) he was denied his right to a speedy trial.
On June 30, 2017, the Court denied the Motion. (See"June 30 Order," Dkt. No. 3.) Pena requested leave to appeal from the United States Court of Appeals for the Second Circuit. (See Dkt. No. 4.) By Order dated February 9, 2018, the Second Circuit granted leave to appeal and simultaneously vacated the June 30 Order in part and remanded the case to provide an opportunity for Pena to amend the Motion and "clarify his claim that '[c]ounsel refused to present a defense, and call witnesses against the [G]overnment['s] case, after specifically being told to do so.' " (See Dkt. No. 6.) Shortly thereafter, the Court directed Pena to "file supplemental papers addressing the issue." (See Dkt. No. 7.)
On March 26, 2018, Pena submitted an amended motion detailing his counsel's alleged failures and requesting: (1) relief under Section 2255 ; (2) discovery; (3) to expand the record; and (4) an evidentiary hearing. (See"Amended Motion," Dkt. No. 8.) The Government opposed and responded to Pena's motion on September 20, 2018. (See"Opposition," Dkt. No. 13.) Pena replied to the Opposition on October 30, 2018. (See"Reply," Dkt. No. 14.) For the reasons discussed below, Pena's Amended Motion is DENIED in its entirety.
I. BACKGROUND
The full background of Pena's case and trial are set forth in further detail in the June 30 Order, and the Court recounts only the facts necessary for addressing the Amended Motion and Pena's claims regarding ineffective assistance of counsel.
Multiple lawyers represented Pena before trial. When Pena was arraigned, Louis Freeman was assigned to represent him. (See Dkt. Minute Entry for June 10, 2011.) After holding a conference regarding Pena's request to substitute counsel, the Court appointed Stanislao German ("German") on February 24, 2012. (See Dkt. Minute Entry for Feb. 24, 2012.) Within two weeks of his appointment, German received the Court's approval to retain the services of investigator Joseph Dwyer ("Dwyer"). (See Dkt. No. 99.) However, Dwyer's investigative service was short lived, and on June 22, 2012, the Court directed German not to employ Dwyer because of a "potential conflict that might exist." (See Dkt. Minute Entry for June 22, 2012.) German then retained the services of Andrew McHale ("McHale") to finish the investigation. In April 2013, the Court set a trial date of October 15, 2013. (See Dkt. Minute Entry for Apr. 26, 2013.) In August 2013, when German indicated that he would be unavailable for the October trial date, the Court substituted Deveraux L. Cannick, who ultimately served as Pena's trial counsel. (See Dkt. No. 173.) According to the affidavit Cannick provided in connection with Pena's Amended Motion,[2] Cannick met with German and *178 McHale to learn about the case and the investigation up to that point. (See "Cannick Aff.," 09 Crim. 0341, Dkt. No. 400 ¶¶ 12-14.) Despite McHale's extensive investigation, which included travel to Florida (see Dkt. No. 137), Cannick directed McHale to investigate even further (see Dkt. No. 240). Cannick did not work alone when representing Pena; he engaged the services of a co-counsel, associate, paralegal, and ballistics specialist. (See Cannick Aff. ¶ 16.)
Pena now alleges that he was denied his right to effective assistance of counsel because Cannick failed to interview certain witnesses and follow up on some of Dwyer's findings. Pena also requests discovery, to expand the record, and an evidentiary hearing.
II. DISCUSSION
As the Court noted in the June 30 Order, Pena is a pro se litigant. As such, the Court remains under an obligation to hold his submissions to "less stringent standards than formal pleadings drafted by lawyers." Ferran v. Town of Nassau, 11 F.3d 21, 22 (2d Cir. 1993) (internal citation omitted).
A. SECTION 2255 AND THE SIXTH AMENDMENT RIGHT TO COUNSEL
A person in federal custody may move to vacate, set aside, or correct his sentence if (1) it was imposed in violation of "the Constitution or laws of the United States"; (2) "the court was without jurisdiction to impose such sentence"; or (3) "the sentence was in excess of the maximum authorized by law, or is otherwise subject to collateral attack." 28 U.S.C. Section 2255(a). One basis for a Section 2255 claim is ineffective assistance of counsel, which is the sole focus of the Amended Motion. Thus the Court restates the law it set out in the June 30 Order regarding ineffective assistance of counsel claims.
The Sixth Amendment guarantees criminal defendants the right to effective assistance of counsel. See U.S. Const. amend. VI ; see also Kimmelman v. Morrison, 477 U.S. 365, 374-75, 106 S.Ct. 2574, 91 L.Ed.2d 305 (1986) ; Aparicio v. Artuz, 269 F.3d 78, 95 (2d Cir. 2001) ("Occasionally, the performance of defense counsel is so dismal that it ripens into the deprivation of counsel altogether and potentially violates the defendant's Sixth Amendment rights."). However, criminal defendants asserting ineffective assistance of counsel must meet a high threshold "in order to deter a baseless attack on the performance of counsel in a last-ditch effort to avoid a conviction or reduce the sentence." Percan v. United States, 294 F.Supp.2d 505, 511 (S.D.N.Y. 2003) ; see also Kimmelman, 477 U.S. at 382, 106 S.Ct. 2574.
To prove ineffective assistance of counsel, the petitioner must satisfy a two-pronged test. First, he must show that "counsel's representation fell below an objective standard of reasonableness" according to "prevailing norms." Strickland v. Washington, 466 U.S. 668, 688-89, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). Second, he must "affirmatively prove prejudice" by showing that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Id. at 693-94, 104 S.Ct. 2052.
Counsel's performance is given a strong presumption of effectiveness, as *179 courts recognize a "wide range of professional assistance." Id. at 689, 104 S.Ct. 2052 ; see also United States v. Yingst, 623 F. App'x 17, 20-21 (2d Cir. 2015) ("The standard for evaluating the adequacy of counsel's representation is 'a most deferential one,' since 'counsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonably professional judgment.' ") (citations omitted). A petitioner cannot merely show that counsel made an error that had "some effect" on the result of trial, for "not every error that conceivably could have influenced the outcome undermines the reliability of the result of the proceeding." Strickland, 466 U.S. at 693, 104 S.Ct. 2052. The errors in counsel's judgment must therefore be "so serious that counsel was not functioning as the 'counsel' guaranteed ... by the Sixth Amendment." Regis v. United States, 665 F.Supp.2d 370, 371 (S.D.N.Y. 2009) (citations omitted); see also United States v. DiTommaso, 817 F.2d 201, 215 (2d Cir. 1987) (stating that the "benchmark for judging any such claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result").
In evaluating whether counsel's errors prejudiced the outcome of the proceeding, the court must consider the totality of the evidence before the jury. Strickland, 466 U.S. at 693, 104 S.Ct. 2052. "[U]nlike the determination whether counsel's performance was deficient, [the prejudice inquiry] may be made with the benefit of hindsight." Morgan v. United States, No. 06-CV-1247, 2009 WL 1172849, at *5 (E.D.N.Y. May 1, 2009) (citing Lockhart v. Fretwell, 506 U.S. 364, 371-73, 113 S.Ct. 838, 122 L.Ed.2d 180 (1993) ); see also Hill v. A.L. Lockhart, 474 U.S. 52, 59, 106 S.Ct. 366, 88 L.Ed.2d 203 (1985) (stating that "[t]he determination whether the error 'prejudiced' the defendant ... will depend in large part on a prediction whether the evidence likely would have changed the outcome of trial"). The standard of proof for the prejudice prong is less than a preponderance of the evidence. See Soto-Beltran v. United States, 946 F.Supp.2d 312, 317 (S.D.N.Y. 2013). However, "some objective evidence other than defendant's assertions [is required] to establish prejudice." Pham v. United States, 317 F.3d 178, 182 (2d Cir. 2003).
A petitioner must satisfy both prongs to obtain relief, but the Supreme Court has stated that "there is no reason for a court deciding an ineffective assistance claim ... to address both components of the inquiry if the defendant makes an insufficient showing on one...." Strickland, 466 U.S. at 697, 104 S.Ct. 2052 ("If it is easier to dispose of an effectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed."); see also Brown v. Artuz, 124 F.3d 73, 80 (2d Cir. 1997) (declining to address the first prong of Strickland on the ground that the defendant could not satisfy the prejudice prong); Rodriguez v. Portuondo, No. 01-CV-0547, 2006 WL 2168314, at *7 n.13 (S.D.N.Y. Aug. 1, 2006).
Pena alleges that Cannick did not provide effective assistance of counsel because Cannick: (1) failed to interview certain individuals who Pena asserted could support an alibi defense; (2) failed to interview Kevin Walla ("Walla"), a police detective who allegedly stated that there was no evidence connecting Pena to certain murders; (3) failed to interview an eye witness who allegedly could provide exculpatory testimony; (4) failed to investigate the circumstances surrounding certain evidence seized by law enforcement; (5) failed to *180 investigate certain phone records; and (6) investigated his case for only one day. Because the Court finds that Pena fails to show that Cannick provided ineffective assistance of counsel for any of these six grounds for relief, the Court denies Pena's request for relief under Section 2255.
1. Alibi Defense
Pena alleges that, before trial, he provided Cannick with information about several individuals who could provide "a viable, provable, alibi defense" but Cannick did not pursue this defense. (Amended Motion at 3.) Pena's alibi defense is that he spent "all night on June 24, 1997 until the next morning, June 25, 1997" with his sister, Anna Vargas. (Id. at 3-4.) According to Pena, he left Vargas's house on June 25, 1997 and went down the street to meet up with "Joe," where the two had "a physical altercation" after a few drinks. (Id. at 4.) During the altercation, Pena fired shots from a handgun into the air, leading to the arrest of Pena and a companion of his, David Torres. Thus, Pena implies that he was wrongfully convicted for the abduction and murder of Jose Suarez ("Suarez") and Juan Carmona ("Carmona"), which occurred during the evening of June 24, 1997. Pena argues that he told Cannick about these Vargas and "Joe," but "Cannick did not interview these witnesses or determine whether this line of defense should be pursued." (Id. at 5.)
The Court is not persuaded that Cannick ignored this defense or that his investigation prejudiced Pena. First, McHale, Pena's investigator, interviewed Vargas, who "did not corroborate Pena's alibi." (Cannick Aff. ¶¶ 31-32.) McHale's timesheet, which describes the work he did after Cannick's appointment, includes one entry for "interview of Anna Vargas" and another, two weeks later, for "[i]nterview and pick up clothes for trial Anna Vargaz [sic]." (Cannick Aff., Ex. A at 1, 2.) While Cannick himself may not have interviewed Vargas, he clearly pursued this possible defense through his qualified investigator.
Similarly, McHale interviewed " 'Joe' as well as a host of other individuals that Pena suggested" but Cannick found that the witnesses had no "information that was beneficial to Pena's defense." (Cannick Aff. ¶¶ 33-34.) Once again, the timesheet at least partly corroborates Cannick's account, as there is an entry for McHale's interview of a "Joe" on October 3, 2013. (Cannick Aff., Ex. A at 2.) That "Joe" had no useful information is unsurprising; he could not have supported an alibi defense. By Pena's own account, he met up with "Joe" on June 25, 1997 and, necessarily, hours after the abduction and murder of Suarez and Carmona. Thus, no prejudice could result from any alleged failure of Cannick to have interviewed "Joe." This fatal flaw in Pena's argument similarly applies to Cannick's alleged failure to interview David Torres or the arresting officers. Like "Joe," none of these individuals could have testified about Pena's whereabouts during the crime.
More fundamentally, Cannick notes that Pena's current alibi is inconsistent with the alibi Pena previously provided to investigators and Dwyer, which was that Pena was with his wife on the evening of June 24, 1997. (See Cannick Aff. ¶¶ 29-30.) The Government argues that this inconsistency would have led to Vargas's impeachment had she testified at trial to Pena's presence at her home during the murder, likely diminishing the import of any testimony on this alibi. (See Opposition at 24.)
Because these witnesses could not have supported Pena's alibi defense, let alone the one Pena already provided to investigators, the Court finds that Pena suffered no clear prejudice and cannot satisfy the prejudice prong of the Strickland test with *181 regards to these alleged failures. Additionally, because Cannick did, in fact, pursue this alibi defense, as corroborated by McHale's timesheet, the Court is persuaded that Cannick's performance was not deficient, especially given the deferential standard that presumes adequate assistance. See Yingst, 623 F. App'x at 20-21. Thus, the Court finds that Pena also cannot satisfy the second prong of the Strickland test with regards to this alleged alibi defense.
2. Interviewing Police Detective Walla
In February 1999, New York City police detectives Walla and Genero Giorgio interviewed Pena about the Suarez and Carmona murders while he was incarcerated on firearm charges. Pena claims that, during this interview, Walla told an unnamed assistant district attorney that Pena could "be excluded as a suspect because there was no evidence connecting him to" the murders. (Amended Motion at 5.) Pena further claims that he informed Cannick of Walla's comment but Cannick failed to interview Walla or the unnamed assistant district attorney.
In connection with the Amended Motion, Walla provided an affidavit expressly rebutting Pena's description of the interview. Walla asserts that he "never made those statements or anything remotely like them." ("Walla Aff.," 09 Crim. 0341, Dkt. No. 402 ¶ 6.) Instead, Walla recalls -- and testified at trial under oath -- that Pena said to "come back when you've got more." (Id. ¶ 4.) Despite these unequivocal statements by Walla, Pena asserts that Walla "clearly states in his reports, affidavits, and testimony at trial that there never was, and still is not enough evidence to indict" Pena. (See Reply at 2.) Pena's reading misconstrues the affidavit, which states that Walla "did not believe then, nor to this day" that Pena "should have been excluded as a suspect" or "that there was no evidence connecting" Pena to the crimes. (Walla Aff. ¶ 6.)
Apart from Walla's direct refutation of Pena's allegation, two other reasons persuade the Court that Pena's claim regarding Cannick's conduct fails. First, Cannick cannot be faulted for not interviewing the investigating officers or prosecutor.[3] Instead, if this line of argument had been viable, Cannick would have had to develop it during Walla's testimony at trial in front of the jury, which would have been difficult and risky absent concrete evidence of Walla's statement. Second, even if Walla testified as to this alleged subjective belief in 1999, that testimony would not have refuted the other overwhelming evidence of guilt presented at trial in 2013.
For these reasons, the Court is persuaded that this basis for relief does not meet either prong of the Strickland test. Even with the benefit of hindsight, the Court does not second-guess Cannick's strategy regarding Walla or find Cannick's representation deficient. See Strickland, 466 U.S. at 689, 104 S.Ct. 2052. Moreover, given the overwhelming evidence of guilt, Pena would not have been prejudiced by the failure to include Walla's alleged beliefs from years prior.
3. Interviewing Gustavo Navarro
Pena also alleges that Cannick rendered constitutionally defective assistance by failing to interview Gustavo Navarro *182 ("Navarro"), who was an eye witness to the abduction of Suarez and Carmona. (See Amended Motion at 6-7.) According to Pena, Navarro told Dwyer that Navarro never saw Pena or someone with his distinctive features during the abduction of Suarez and Carmona. Further, Pena claims that police conducted a line-up including Pena, but Navarro did not pick Pena out of that line-up. Pena also claims that Dwyer wrote a report with this information and gave it directly to Cannick, who then "failed to investigate or make a reasonable determination." (Id. at 6.)
The Court is not persuaded that Cannick's representation regarding this episode was deficient because Pena's allegations contain numerous logical infirmities. First, Dwyer could not have provided any such report to Cannick, because McHale replaced Dwyer well before Cannick was appointed.[4] (Cannick Aff. ¶¶ 4, 26.) Second, no record exists of Navarro reviewing a line-up that included Pena, or even a single photo of Pena. (See Opposition at 34.) Third, Dwyer likely never spoke with Navarro. Dwyer worked as an investigator for only four months before McHale replaced him, and Cannick possessed all of Dwyer's notes. (See Cannick Aff. ¶ 27.) Dwyer's memorandum to file which was written a month before he came off the case, makes no mention of Navarro or anyone who would fit the description of an eye witness. (See Cannick Aff., Ex. B.) Indeed, as the Government notes, even law enforcement was unable to locate Navarro for use as a witness despite "substantial efforts." (See Opposition at 33 n.6.) Fourth, even the day after the crime, Navarro told police that "[h]e does not believe he can ID males in either a [l]ine-[u]p or [a]rray" (Opposition at Ex. E) in part because of the poor "lighting conditions" (id. at Ex. F) that morning. It is unlikely that, fifteen years later, when supposedly speaking to Dwyer, Navarro could have confidently and credibly excluded Pena.
Taking these points together, it is implausible that Navarro could have provided helpful testimony, and even less likely that Dwyer found Navarro but that Cannick ignored a potential witness. Navarro's uncertain testimony more than a decade later could not have overcome the substantial evidence of guilt at trial, thus Pena could not have been prejudiced by the lack of Navarro's testimony. For these reasons, Court finds that Pena's basis for relief about Navarro's testimony fails to meet either prong of the Strickland test.
4. Evidence Seizures
Pena also asserts that Cannick failed properly to investigate the circumstances regarding evidence seized from two separate searches: one of Pena and his vehicle on June 25, 1997; the other of a parking lot on May 6, 1998. (See Amended Motion at 4-5.) The first search was conducted as part of Pena's arrest for his firing of a handgun, whereas the second was conducted at a parking lot frequented by "members of a drug trafficking crew called 'Solid Gold' " and others, such as Pena himself. (Opposition at 6.) The officers responsible for the searches memorialized the evidence collected during the searches on vouchers. (See Opposition Exs. A, B.)
Pena alleges that police officers improperly attributed evidence collected during *183 the parking lot search to the earlier search of Pena and his vehicle. Pena claims that Dwyer "had evidence" supporting this allegation and wrote a report of his finding, which he allegedly gave to Cannick with instructions to give the report to Pena, but Cannick failed to follow up on Dwyer's findings. (Amended Motion at 7.) Specifically, Pena claims Cannick failed to (1) interview individuals present during the search of the parking lot; (2) interview the officers involved in the search of the parking lot; (3) "obtain a copy of the search warrant issued for the parking lot"; and (4) "obtain a copy of the inventory of any items seized" during the parking lot search. He argues that the evidence vouchers for the search are "contradict[ory] and fraudulent." (Id. at 12.) Specifically, he points out that one of the vouchers cataloging the contents seized during the search after his arrest improperly lists the date of Pena's arrest as June 26, 1997, whereas the other two vouchers correctly list the arrest date as June 25, 1997. (Id.; see Opposition Ex. A at 2.) Pena also claims that the handwritten, as opposed to typed, arrest number on certain vouchers "is not normal procedure." (Reply at 13.)
Once again, the Court is persuaded that Pena's claim fails to meet the Strickland test. First, the Court notes, as it already has, that Dwyer could not have provided such a report directly to Cannick. (See Cannick Aff. ¶¶ 26-27.) If anything, Dwyer's memorandum to file undermines Pena's efforts in his Reply to distance himself from the parking lot, because the memorandum makes clear that during an interview with Pena, the two discussed a vehicle Pena kept there. (See Cannick Aff., Ex. B at 1.)
Second, even if Cannick had not sought the records, the Government provided search warrants and evidence vouchers ahead of trial. (See Opposition at 27 n.3.) Nothing about the records undermines the Court's confidence in Cannick's representation of Pena or the verdict at trial. Although Pena notes certain typographical errors and other features of the vouchers from his 1997 arrest, he provides no evidence of any of the doctoring he alleges.[5] In contrast, the officers who conducted the searches testified at trial and provided credible testimony about what they found and the vouchering process. (See Trial Tr. at 492-503, 769-82.) Cannick cannot be faulted for failing to cross-examine the officers about doctoring vouchers given that there was no evidence of doctoring. In short, Pena's unsubstantiated claim does not constitute "objective evidence other than defendant's assertions" and fails to establish prejudice. Pham, 317 F.3d at 182. The Court therefore rejects Pena's claims about the searches.
5. Phone Records
Pena presents two arguments regarding Cannick's alleged failure to collect certain phone records. In one, he attempts to reargue the Court's jurisdictional findings about payphones at the parking lot. (See Amended Motion at 8.) The Court already addressed this issue in the June 30 Order, when it held that "the Government presented ample witness testimony to establish that the pay phone at issue was a 'facility of interstate commerce.' " (June 30 Order at 16.) Thus, Cannick could not have been defective by failing to collect the telephone records of the payphones, and this argument is beyond the scope of the Second Circuit's remand.
As for Cannick's alleged failure to obtain the telephone records of the cellphone, *184 pager, and hand radio found on Pena during his 1997 arrest, Pena does not attempt to explain how failing to collect those rudimentary phone records could have prejudiced him. Moreover, there is no evidence indicating that Cannick would have found the sixteen-year old records if he tried. In light of the overwhelming evidence of Pena's guilt, these conclusory allegations also fail "to undermine confidence in the outcome" of his case. Strickland, 466 U.S. at 694, 104 S.Ct. 2052.
6. Cannick's Efforts
Finally, Pena asserts that Cannick's investigation "consisted of less than one day of making telephone calls to persons other than those listed herein." (Amended Motion at 9.) Pena argues that "an attorney is ineffective when his investigation [is] limited to one day of interviewing witnesses." (Id. )
The Court is not persuaded by Pena's argument, which is belied by the record. The Court notes that Cannick came into the case after German, Pena's prior counsel, and McHale had done substantial work on the case. Then, despite German's prior work and McHale's exhaustive investigation that took him as far as Florida, Cannick requested even more resources to help prepare for trial-a request that the Court granted. As evidenced by the timesheets, Cannick's team spent days interviewing witnesses, making calls, and preparing for trial. The Court finds that Cannick's preparations for trial did not fall "below an objective standard of reasonableness" and consisted of more work than what Pena describes. Strickland, 466 U.S. at 688-89, 104 S.Ct. 2052.
B. Discovery Requests
The Second Circuit's remand directed the Court to consider whether to allow the parties to expand the record. Pena explicitly requests that the Court expand the record, and also requests that the Court order discovery and conduct an evidentiary hearing. (Amended Motion at 10-11.)
Discovery is not granted as of right in Section 2255 cases. Instead, under Rule 6 of the Rules Governing Section 2255 Proceedings for the United States District Courts, the Court can grant discovery upon a showing of "good cause." Drake v. Portuondo, 321 F.3d 338, 346 (2d Cir. 2003) (granting discovery in part because of the prosecution's "covert and evasive" behavior regarding incriminating perjured testimony).
A court may also "expand the record" and direct parties to file affidavits or other relevant materials under Rule 7 of the Rules Governing Section 2255 Proceedings for the United States District Courts. See Fulton v. Graham, 802 F.3d 257, 266 (2d Cir. 2015). Here, for example, the Court ordered Cannick to provide an affidavit responsive to Pena's claims. (See Dkt. No. 391.)
Additionally, where necessary, a court should hold an evidentiary proceeding to resolve issues of fact raised by a Section 2255 petition. However, movants like Pena are not entitled to a hearing simply upon filing a Section 2255 case. See Newfield v. United States, 565 F.2d 203, 207 (2d Cir. 1977). When there are no plausible claims of ineffective assistance of counsel, a court may dismiss such claims without an evidentiary hearing. See Pham, 317 F.3d at 184 ; United States v. Stantini, 85 F.3d 9, 17 (2d Cir. 1996).
The Court denies Pena's request to further supplement the record, through discovery, expanding the record, or holding an evidentiary hearing, because such measures are unnecessary to decide this case. Although Pena at first strategically *185 declined to make specific discovery requests without assistance from counsel (see Amended Motion at 11), Pena now includes the list of items he seeks in his Reply (see Reply at 11-12). The list includes numerous requests that have nothing to do with the ineffective assistance of counsel claim, or simply do not and cannot exist. (See, e.g., id. (requesting "all evidence," store receipts, ballistic records, as well as visitation records and affidavits that do not exist).)
For many of the remaining items on Pena's list, the Court has already expanded the record to include either the requested items or other relevant items that go to the same issues. Cannick submitted an affidavit, which attaches a memorandum to file from Dwyer and timesheets from McHale. Detective Walla also submitted an affidavit, and the Opposition includes numerous exhibits pertaining to the specific issues Pena raises in the Amended Motion. These affidavits and exhibits address Pena's request to see Dwyer's memorandum to file, McHale's reports and Cannick's affidavits. (See id. )
The Court finds that the substantial materials before it conclusively resolve the Amended Motion. Pena does not demonstrate that any other materials, if provided, would entitle him to relief. Thus, the Court finds no need to supplement the record further in this case. Moreover, because the Court finds, after a thorough review of the record, that Pena's claims present no factual disputes, it also finds no need for an evidentiary hearing. Therefore, the Court denies Pena's requests regarding discovery, supplementing the record, and an evidentiary hearing.
III. ORDER
For the reasons stated above, it is hereby
ORDERED that the amended motion (Dkt. No. 8) of movant Hector Pena ("Pena") to vacate, set aside, or otherwise correct his conviction and sentence under 28 U.S.C. Section 2255 is DENIED. Pena's associated requests for discovery, to expand the record, and an evidentiary hearing are also hereby DENIED .
As Pena has not made a substantial showing of a denial of a constitutional right, a certificate of appealability will not issue. See 28 U.S.C. Section 2253(c)(1)(B).
The Court certifies under 28 U.S.C. Section 1915(a)(3) that any appeal from this order would not be taken in good faith, and therefore in forma pauperis status is denied for the purpose of an appeal. See Coppedge v. United States, 369 U.S. 438, 444-45, 82 S.Ct. 917, 8 L.Ed.2d 21 (1962).
SO ORDERED.

Unless otherwise specified, all docket numbers refer to 17 Civ. 3891.

Even though Pena requests that the Court expand the record, he also protests that Cannick "produc[ed] [an] affidavit [ ] to be used against" him. Pena casts the affidavit as evidence of "attorney misconduct." (Reply at 2-3.) Cannick, of course, produced the affidavit in response to an Order from this Court, and Pena waived attorney-client privilege for those purposes. (See Dkt. No. 11.) There is nothing improper about this process, and courts regularly evaluate affidavits from counsel when deciding ineffective assistance claims. See, e.g., Chang v. United States, 250 F.3d 79, 86 (2d Cir. 2001) (affirming denial of habeas petition without a hearing, in part because "counsel's detailed description of events was eminently credible").

The signed Miranda warning document from the interview lists Detective Genero Giorgio as the other participant in the interview. This documentation implies, contrary to Pena's assertion, that no assistant district attorney was present with Walla. (See Opposition Ex. C.) As such, Cannick also cannot be faulted for not finding the unnamed assistant district attorney.

Even accounting for Pena's status as a pro se litigant and holding his submissions to a less stringent standard, Pena's claims about what Dwyer provided are very specific and implausible. Pena alleges that Cannick and Dwyer visited him together while Pena was incarcerated before trial. (See Reply at 11.) Pena never claims that Cannick merely received Dwyer's alleged report from a third party.

Presumably, during the prosecution stemming from the 1997 arrest, authorities would have provided Pena and his attorney the same exact voucher information. Pena does not allege or show that the list of contents on the vouchers changed between prosecutions.