**Negash MALEDE, Appellant,**

v.

**UNITED STATES, Appellee.**

**Nos. 96–CF–737, 99–CO–44.**

District of Columbia Court of Appeals.

Argued Sept. 21, 2000.
Decided Feb. 22, 2001.

to meet any particular interpretation.

Matthew C. Leefer, Boonsboro, MD, appointed by the court, for appellant.

Karla Dee Clark, Assistant United States Attorney, with whom Wilma A. Lewis, United States Attorney, and John R. Fisher, Thomas J. Tourish, Jr., and Heather Cartwright, Assistant United States Attorneys, were on the brief, for appellee.

Before STEADMAN, FARRELL, and GLICKMAN, Associate Judges.

FARRELL, Associate Judge:

After a bench trial, appellant Malede was found guilty of stalking, two counts of felony threats, assault with intent to kill while armed, and related weapons offenses. He contends that the trial judge, sitting as factfinder, erroneously rejected his defense of insanity[1] and that the judge later erred in denying without a hearing his motion under D.C.Code § 23–110 alleging a "conflict of interest" and ineffective assistance on the part of his trial attorney. We affirm.

## I.

Malede did not dispute that he shot and seriously wounded Tigest Bekele, a woman with whom he had had a prior personal relationship, in Southwest Washington on April 23, 1994. His defense at trial was insanity, which the law required him to prove by a preponderance of the evidence. *See* D.C.Code § 24–301(j) (1996); *Bethea v. United States,* 365 A.2d 64, 83 n. 38 (D.C.1976). He attempted to do so principally through the testimony of Dr. Robert K. Madsen, an expert in psychology and forensic psychology. The trial judge, however, found that neither that testimony nor any other evidence established preponderantly that on April 23, 1994, Malede shot Ms. Bekele as a result of a mental disease or defect which caused him to lack substantial capacity either to recognize the wrongfulness of his conduct or to conform his conduct to the requirements of the law. *See Wilkes v. United States,* 631 A.2d 880, 882 n. 4 (D.C.1993); *Bethea,* 365 A.2d at 79. Since the judge's subsidiary findings on the issue are well supported by the record, we may not disturb them. D.C.Code § 17–305(a) (1997). Even conceding that Malede suffered from a mental disease or defect at the time of the acts charged (an issue on which the judge found "some doubt"), the trial judge had a solid factual basis on which to conclude that Malede had failed to establish a causal connection between that condition and the criminal acts.[2]

## II.

Malede's more substantial contention is that by the time of trial his court—appointed attorney, Thomas Farquhar, had become so hostile to him—even expressing

1. The government asserts that Malede raised insanity at trial only with respect to three of the charges against him, those arising from his shooting of the victim on April 23, 1994. Our disposition of the issue makes it unnecessary to decide whether the insanity defense— and hence Malede's claim on appeal—relates to all or only part of his convictions.

2. Even Dr. Madsen did not conclude that Malede could not appreciate the wrongfulness of his actions on April 23, 1994, or that he was unable to control his conduct and conform it to the law on that occasion. The testimony of the government's expert, Dr. David Shapiro, was to the same effect.

that hostility on the record-as to create an actual "conflict of interest" between the two that deprived Malede of his right to the effective assistance of counsel. *Cuyler v. Sullivan,* 446 U.S. 335, 100 S.Ct. 1708, 64 L.Ed.2d 333 (1980); *see Strickland v. Washington,* 466 U.S. 668, 692, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984).

The relationship that developed before trial between Malede and Farquhar, his third appointed counsel, is troublesome because it reached the point where Farquhar, in a written motion to withdraw from the case, claimed that Malede had "falsely accus[ed him] of all kinds of misconduct" such that counsel "no longer feels he can effectively represent this *malevolent little man*" (emphasis added). Farquhar was responding to written assertions Malede had made to the trial judge and Bar Counsel that Farquhar asked him for $5,000 to retain a defense psychiatrist, which Malede saw as an effort by his lawyer to "pad[ ] his pocket," and that Farquhar verbally abused him by "cursing [him] and calling [him] stupid."[3] Mutual hostility of that apparent intensity naturally requires close examination of whether Farquhar remained capable of representing Malede with undivided loyalty.

In denying Malede's post-conviction motion, the trial judge pointed out that, notwithstanding the ill-feelings between client and attorney, Malede had twice stated in open court that he wanted Farquhar to continue to represent him. Specifically, on June 23, 1995, Malede (after consulting with yet another appointed attorney)[4] declared that he wanted Farquhar to remain as his attorney provided they communicated through a language interpreter. Al-

though Malede wrote letters to the court during the summer again requesting that Farquhar withdraw because of "the enmity that has developed between us," at a status hearing on September 27, 1995, when asked by the judge whether, "as of today, [you are] satisfied with Mr. Farquhar's work as your lawyer," he answered "yes." He made no complaint during trial about his relationship with Farquhar. Malede nevertheless argues on appeal that this record is too sparse to permit a conclusion that he "waived" any conflict of interest, *see Douglas v. United States,* 488 A.2d 121, 138 (D.C.1985), and the government does not appear to argue the contrary. Given the terseness of the exchange between the judge and Malede at the September 27 hearing, and the government's disinclination to press the point, we agree that any conflict was not waived.[5] We therefore must consider whether in fact the hostility between Malede and Farquhar was of such a nature or magnitude as to create an "actual conflict of interest" affecting the representation. *Cuyler v. Sullivan,* 446 U.S. at 350, 100 S.Ct. 1708.

■ Under *Cuyler,* a violation of the Sixth Amendment right to counsel is shown "if the defendant demonstrates that counsel 'actively represented conflicting interests' and that 'an actual conflict of interest adversely affected his lawyer's performance.'" *Strickland,* 466 U.S. at 692, 104 S.Ct. 2052 (quoting *Cuyler,* 446 U.S. at 350, 100 S.Ct. 1708). Such a conflict is typically shown when the defense attorney "is 'required to make choices advancing [another client's] interest to the detriment of his [current] client's interest.'" *Veney*

---

**3.** Malede also complained that Farquhar, contrary to his promise, had not helped Malede regain custody of his automobile (which the police had seized) and had proposed selling the car to a dealer friend of Farquhar's for $4,000 when "newspaper prices" valued the car at $7,000.

**4.** The judge appointed this attorney, Steven Jackson, to consult with Malede after a doctor who examined Malede on the issue of compe-

tency suggested that his difficulties with counsel might stem from language and cultural barriers (Malede is an immigrant from Ethiopia). Jackson had previously represented persons of the same cultural background.

**5.** Further questioning of Malede at some point about the basis of his complaints against Farquhar might have mooted the issues we now face.

v. United States, 738 A.2d 1185, 1192 (D.C. 1999) (citations omitted; bracketed language in original).[6] Malede's claim of conflict does not fit the multiple-client mold. Instead, the parallel he claims is with cases such as Douglas, in which a conflict of interest was found where the defendant complained of his lawyer's performance to Bar Counsel and the lawyer thereby acquired a personal, potentially conflicting interest in how the defense would be conducted. 488 A.2d at 136–37. Malede too lodged a complaint against Farquhar with Bar Counsel. Most courts, however, have understandably refused to find a conflict of interest any time a defendant takes his grievance about counsel's performance to the disciplinary authority, for such a rule "would invite criminal defendants anxious to rid themselves of unwanted lawyers to queue up at the doors of bar disciplinary committees on the eve of trial." United States v. Burns, 990 F.2d 1426, 1438 (4th Cir.1993); see also State v. Johnson, 227 Ill.App.3d 800, 169 Ill.Dec. 858, 592 N.E.2d 345, 355 (1992) (citing cases rejecting such a per se rule). For this reason, in Douglas we pointed to the fact that Bar Counsel had already begun an investigation into the complaint against counsel at the time the issue arose in court, giving the attorney ten days to respond to the grievances in writing. 488 A.2d at 128; see also id. at 136 ("[A]s soon as [attorney] Kane learned of Bar Counsel's intention to pursue an investigation of appellant's complaint, he acquired a personal interest in the way he conducted appellant's defense."). The resulting circumstances, we found, "were not conducive to the cooperative spirit and singlemindedness of purpose that ordinarily should underlie a defendant/attorney relationship." Id. at 137.

6. Cf. also Thomas v. United States, 685 A.2d 745 (D.C.1996) (counsel's loyalty may have been adversely affected by her personal relationship to a police officer).

7. We distinguish this situation from the one in Smith v. Lockhart, 923 F.2d 1314, 1321 (8th

Bar Counsel had not begun an inquiry into Malede's complaint at the time of trial, and we decline to hold that the bare filing of the disciplinary complaint created a conflict of interest necessitating Farquhar's discharge from the case.[7] Malede contends, however, that the hostility and contempt Farquhar expressed towards him in moving to withdraw guaranteed that he would be disloyal or at least conflicted in his continuing representation of Malede. Farquhar's language was certainly intemperate; and we can agree that it ill-befits a member of the Bar to denounce his client in a court document as a "malevolent little man," no matter what the perceived provocation. But an actual conflict of interest under Cuyler is not shown merely by an attorney's vehemence in disputing a client's complaint of wrongdoing. If it were, then a good many claims of defective representation against which an attorney defends before trial would demand near-automatic replacement of counsel despite our decisions holding that the proper remedy in such circumstances is inquiry by the court into the adequacy of counsel's pretrial preparation, and any necessary remediation. See Monroe v. United States, 389 A.2d 811 (D.C.1978); Farrell v. United States, 391 A.2d 755 (D.C.1978). Nor is an actual conflict created simply by the attorney's request to be relieved of the representation because he takes the accusations personally. The trial court still must have discretion to decide whether counsel, appointed under the Criminal Justice Act, can continue to provide the effective assistance which the Constitution requires.

We therefore are unpersuaded by Malede's argument that Farquhar's expressed hostility to him in moving to withdraw was enough to create an actual con-

Cir.1991), where the fact of an impending "federal lawsuit pitting the defendant against his attorney" created an actual conflict of interest requiring substitution of appointed counsel.

flict of interest. Even if it did, moreover, a conflict alone is not enough to permit reversal of a conviction on appeal. In addition, the conflict must be shown to have adversely affected the trial attorney's performance. *Strickland,* 466 U.S. at 692, 104 S.Ct. 2052. Ordinarily this means that there must be some indication that "the attorney's and the defendant's interests 'diverge[d] with respect to a material factual or legal issue or to a course of action.'" *Veney,* 738 A.2d at 1192–93 (quoting *Winkler v. Keane,* 7 F.3d 304, 307 (2d Cir.1993)) (in turn quoting *Cuyler,* 446 U.S. at 356 n. 3, 100 S.Ct. 1708 (Marshall, J., concurring in part and dissenting in part)). *See also United States v. Stantini,* 85 F.3d 9, 16 (2d Cir.1996) (To prove "lapse of representation" under *Cuyler,* defendant "must 'demonstrate that some plausible alternative defense strategy or tactic might have been pursued' but was not and that 'the alternative defense was inherently in conflict with or not undertaken due to the attorney's other loyalties or interests.'") (quoting *Winkler,* 7 F.3d at 309); *United States v. Soldevila–Lopez,* 17 F.3d 480, 486 (1st Cir.1994) (same); *United States v. Gambino,* 864 F.2d 1064, 1071 (3d Cir.1988) (same).[8] As we stated in *Derrington v. United States,* 681 A.2d 1125 (D.C.1996), "the appellant must be able to 'point to specific instances in the record to suggest an actual conflict or impairment of [his or her] interests.'" *Id.* at 1133 (citation omitted).

■ Malede alleged no such divergency of interests in his § 23–110 motion; his only contention was that Farquhar's pursuit of the insanity defense was "intolerably deficient." The trial judge found this assertion to be conclusory and unsubstantiated, so as to obviate the need for an evidentiary hearing. We agree. Malede complained, for example, of Farquhar's failure to make additional friends and associates of the defendant available to experts who evaluated his mental state, but Malede made no proffer by affidavit or otherwise of how those persons would have supported the insanity defense. *See Fields v. United States,* 698 A.2d 485, 489 (D.C.1997).[9] His additional claim that counsel had "failed to fairly or meaningfully consult with or advise him" was likewise conclusory; he did not allege that Farquhar pursued a defense strategy different from the one Malede wanted, or that Malede had information relevant to the defense that Farquhar had failed to obtain from him. In his brief on appeal, Malede likewise does not claim that he and Farquhar disagreed that insanity was the only viable defense, nor that Farquhar failed to pursue the defense vigorously.

■ Malede focuses instead upon Farquhar's statement in the motion to withdraw that Malede had "falsely accus[ed him] of all kinds of misconduct." This assertion, Malede argues, was tantamount to telling the judge who then sat as trier of

---

**8.** Illustrative is *United States v. Shorter,* 54 F.3d 1248, 1253 (7th Cir.1995), in which the defendant asserted that counsel, forced to continue a representation he had sought to withdraw from before sentencing because of allegations by the defendant, failed to argue for a departure from the Sentencing Guideline.

**9.** Malede did not actually name any such persons, instead referring to medical reports in which experts had mentioned particular persons they had been unable to interview. But, although Dr. Madsen (for instance) had been unable to interview Abera Beyene, the person who had gone with Malede to the police on the day of the offense, he noted that another physician, Dr. Bernthal, had interviewed Bey-

ene together with counsel, and Dr. Madsen had taken their comments into account in formulating his opinion. Further, Dr. Madsen ultimately succeeded in interviewing Malede's employment supervisor, something he had been unable to do initially.

Dr. Bernthal, who made a court-ordered evaluation of Malede but did not testify, pointed out in her report that she had been "unable to locate several other individuals who observed [appellant] around the time of the alleged offense," and that Farquhar had not assisted her in locating them. Again, however, Malede did not identify any such individuals to the court or proffer how they might have supported his insanity defense.

fact not to believe Malede in evaluating his defense of insanity.[10] We agree that if a defense lawyer effectively discredits his client before the factfinder on the defense presented, it is inconsequential that no "plausible alternative defense strategy" was available for the lawyer to pursue. *Stantini,* 85 F.3d at 13. The mischief lies in what counsel did, not in what else he might have done. Such a case was *Butler v. United States,* 414 A.2d 844 (D.C.1980) (en banc), in which an attorney justifying himself before trial against claims of inadequate preparation told the judge that this was "an open and shut case" and that his client's real complaint was that counsel would not put him on the stand and sponsor perjury without telling the court (the defendant wanted to deny that he had the gun in question despite having told counsel the contrary). *Id.* at 845. After the case went to trial before the same judge as factfinder, we reversed, stating (among other things) that "[i]t is difficult to imagine how the neutrality of a judge could remain free from compromise when [he] had been told by defense counsel that the government's case can be proved ... and that the defendant intends to commit perjury." *Id.* at 852.

But Farquhar's statements are not comparable to those in *Butler.* Still early in the representation, he denied as "false" accusations Malede had made on matters—*i.e.,* whether Farquhar had been "intent on padding his pocket[s]" at Malede's expense or had "curs[ed him] and call[ed him] stupid"—that were obviously collateral to any defense he and Malede might present. The argument that this denial compromised Malede's insanity defense at trial seven months later is fanciful. In the interim, two psychiatric examinations on responsibility were conducted, one by each party, and testimony by those experts was the centerpiece of the evidence at trial which the judge carefully analyzed and relied on in reaching his decision. Farquhar's response to Malede's complaints, while disparaging of his client, had no identifiable effect on the defense strategy he then followed, the skill or vigor with which he pursued it, or the chances of that defense prevailing. Malede's credibility was indeed an issue at trial, as he argues, but only in the sense that both *psychiatrists*—defense as well as government—assayed his claim that mental illness caused him to do the shooting and found it inconsistent with the objective facts; the judge essentially had no evidentiary basis on which to reach a different conclusion.[11]

All told, then, any arguable conflict Farquhar experienced in his loyalty to Malede did not adversely affect his performance. *Cuyler, supra.*

■ We reject, lastly, Malede's argument that Judge Weisberg should have recused himself from trial after learning Farquhar's negative opinion of his client's character for truth-telling. (We reject as well the argument that an evidentiary hearing was needed to explore that issue.) There is no support whatever for an inference that the judge was influenced in evaluating the evidence by his knowledge of the recriminations between lawyer and client before trial. As explained, nothing Farquhar told the judge reflected any opinion of Malede's defense, and there is no suggestion in the record that the judge had "attempted to evaluate the defense or the government's case ... prior to hearing the ... witnesses" at trial. *Banks˚ v. United States,* 516 A.2d 524, 529 (D.C. 1986).

*Affirmed.*

---

10. Malede does not contend that Farquhar induced him to elect a bench trial before the judge which he otherwise would not have chosen. The trial judge painstakingly established that Malede's waiver of a jury trial was knowing and voluntary.

11. No argument is made that Farquhar did not conscientiously pursue a plea disposition with the government, something Malede had asked him to do.

GLICKMAN, Associate Judge, dissenting:

I respectfully dissent. I think that the trial court was obligated to hold a hearing on appellant Malede's § 23–110 motion. A hearing was necessary under D.C.Code § 23–110(c) (1996) in order to determine whether Malede's accusations of wrongdoing against his court-appointed trial counsel were meritorious—a determination that correlates with whether his counsel had an "actual" conflict of interest within the meaning of *Cuyler v. Sullivan,* 446 U.S. 335, 350, 100 S.Ct. 1708, 64 L.Ed.2d 333 (1980). In holding otherwise, the majority opinion conflicts, in my view, with this court's decision in *Douglas v. United States,* 488 A.2d 121 (D.C.1985), as well as with a number of federal circuit court decisions. Those decisions recognize that "[w]hen a defendant accuses his counsel of improper behavior and the counsel disputes his client's accusations," then unless the accusations are frivolous "an actual conflict of interest results because any contention by counsel that defendant's allegations were not true would ... contradict his client." *United States v. Shorter,* 54 F.3d 1248, 1252–53 (7th Cir.1995) (internal quotations marks and citations omitted). Further, if Malede's accusations were not frivolous, I think the resultant actual conflict "adversely affected his lawyer's performance" within the meaning of *Cuyler,* as demonstrated by counsel's statements to the trial judge that Malede was a malevolent liar. In holding that those statements did not demonstrate an adverse effect on counsel's performance, the majority opinion fails, in my view, to adhere to the rule that no showing of prejudice is required to establish ineffective assistance of counsel under *Cuyler,* 446 U.S. at 349, 100 S.Ct. 1708, and *Strickland v. Washington,* 466 U.S. 668, 692, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984).

The salient facts are these. To the trial judge and to Bar Counsel, Malede made factually specific accusations of wrongdoing on the part of his trial counsel. As the majority opinion recites, Malede alleged that his court-appointed counsel had tried to line his own pockets by asking him for $5,000 to retain a defense psychiatrist; that his counsel had broken a promise to help him regain custody of his automobile; that his counsel had proposed selling the automobile to counsel's friend for less than fair market value; and that his counsel had verbally abused him and was extremely hostile to him. Malede's counsel responded to Malede's accusations by moving to withdraw from the representation. In his motion, counsel stated to the court that Malede had "falsely accus[ed him] of all kinds of misconduct" and that counsel "no longer feels he can effectively represent this malevolent little man." The trial court did not grant counsel's motion to withdraw. Although Malede did not waive any conflict of interest or withdraw his accusations, counsel continued to represent Malede through trial despite reiterated requests by Malede that he be replaced. (After trial, the court did replace counsel when Malede renewed his complaints of ineffectiveness.)

Malede's accusations against his counsel may have been entirely false and utterly defamatory. But while the trial court took commendable steps to alleviate Malede's difficulties in maintaining an attorney-client relationship, the court did not inquire into whether Malede's accusations were without foundation or advanced in bad faith, and the record in its current state does not permit us to say that.

The Sixth Amendment right to the effective assistance of counsel encompasses a right to counsel whose loyalty to the defendant is unconflicted. *See Douglas,* 488 A.2d at 136. Under *Cuyler* and *Strickland,* the question of whether Malede is entitled to relief for a Sixth Amendment violation turns on whether his counsel "actively represented conflicting interests" and whether "an actual conflict of interest adversely affected his lawyer's performance." *Strickland,* 466 U.S. at 692, 104 S.Ct. 2052; *Cuyler,* 446 U.S. at 350, 100

S.Ct. 1708. If so, then Malede "need not demonstrate prejudice in order to obtain relief." *Cuyler,* 446 U.S. at 349–50, 100 S.Ct. 1708 (citing *Holloway v. Arkansas,* 435 U.S. 475, 487–91, 98 S.Ct. 1173, 55 L.Ed.2d 426 (1978)). "Prejudice is presumed." *Strickland,* 466 U.S. at 692, 104 S.Ct. 2052. *Accord, Veney v. United States,* 738 A.2d 1185, 1193 and n. 10 (D.C. 1999); *Thomas v. United States,* 685 A.2d 745, 751 (D.C.1996); *Douglas,* 488 A.2d at 136 n. 16.

Many cases recognize that when a defendant makes non-frivolous accusations of wrongdoing against his attorney, which the attorney disputes, an actual conflict of interest arises and the *Cuyler–Strickland* test is satisfied. In this jurisdiction, that is the import of *Douglas,* 488 A.2d at 136–37. In *Douglas* the defendant complained to Bar Counsel about his attorney's allegedly insufficient effort to obtain a bond reduction. We found it immaterial that this complaint was—like Malede's complaints here—"unrelated to [counsel's] trial preparation or performance." *Id.* at 126. We recognized that "as soon as [counsel] learned of Bar Counsel's intention to pursue an investigation of appellant's complaint, he acquired a personal interest in the way he conducted appellant's defense—an interest independent of, and in some respects in conflict with, appellant's interest in obtaining a judgment of acquittal" which constituted a "conflict of interest [that] would have adversely affected [counsel's] ability to render effective assistance to appellant at trial." *Id.* at 136–37. *See also Shorter,* 54 F.3d at 1252 (at sentencing and in a motion to withdraw, counsel stated that defendant had falsely accused her of forcing him to plead guilty; court agrees that "counsel's action demonstrated a conflict of interest which prevented the attorney from representing him at sentencing with undivided loyalties"); *Smith v. Lockhart,* 923 F.2d 1314, 1320–22 (8th Cir.1991) (defendant filed lawsuit against his counsel; court holds that counsel had an interest that conflicted with defendant's); *Mathis v. Hood,* 937 F.2d 790, 795–96 (2d Cir.1991) (defendant filed grievance against his counsel with disciplinary committee; court finds that counsel had an "adverse interest in the outcome" of defendant's case).

In *Douglas,* Bar Counsel had already begun to investigate the complaint against the attorney, whereas in the present case it appears that Bar Counsel's investigation was on hold pending the outcome of Malede's trial. *See Douglas,* 488 A.2d at 126. The majority opinion suggests that it was only because the disciplinary investigation had actually begun in *Douglas* that the resulting circumstances "were not conducive to the cooperative spirit and single-mindedness of purpose that ordinarily should underlie a defendant/attorney relationship." *Ante* at 271 (quoting *Douglas,* 488 A.2d at 137). With respect, I think that this is not a meaningful ground for distinguishing *Douglas* from the present case. Malede's counsel could look forward to a Bar Counsel investigation commencing after trial. From counsel's perspective, the fact that the sword of Damocles had not yet begun to fall, but was still hanging over his head, does not alter the fact that he was still under a threat of decapitation because his client had become adverse to him.[1] Certainly the reaction of

---

1. Thus, everything we said in *Douglas* about how the pendency of the Bar Counsel inquiry might have impaired counsel's undivided loyalty to his client is applicable here:

"For instance, fearing that appellant's complaint to Bar Counsel might later be expanded to include claims of ineffective assistance at trial, [counsel] would have an inordinate interest in conducting the defense in a manner calculated to minimize any opportunity for *post hoc* criticism of his efforts. This could compromise [counsel's] professional judgment about the best means of defending this particular case; it could encourage the most standard or conservative trial strategy, as well as overcautious tactical decisions and courtroom demeanor. Furthermore, concerns about the pending investigation might impede communications between appellant and [counsel]. [Counsel] might be apprehensive about sharing with appellant the reasons behind

Malede's counsel—to inform the judge who would both try and sentence Malede that his client was a malevolent liar—demonstrates emphatically that the circumstances resulting from Malede's accusations of wrongdoing, even though not yet being investigated by Bar Counsel, "were not conducive to the cooperative spirit and singlemindedness of purpose" that *Douglas* deemed essential. *Douglas*, 488 A.2d at 137.

Concerned that finding a conflict of interest whenever a defendant files a grievance against his counsel "would invite criminal defendants anxious to rid themselves of unwanted lawyers to queue up at the doors of bar disciplinary committees on the eve of trial," *United States v. Burns*, 990 F.2d 1426, 1438 (4th Cir.1993), the majority opinion declines to hold that "the bare filing" of a disciplinary complaint creates an actual conflict of interest.[2] *Ante* at 271. As an abstract proposition, I agree with that statement. The defendant's accusations must be non-frivolous. *See Mathis*, 937 F.2d at 796. "Allegations of wrongdoing alone cannot rise to the level of an actual conflict unless the charges have some foundation." *United States v. Contractor*, 926 F.2d 128, 134 (2d Cir.1991) (quoting *United States v. Jones*, 900 F.2d 512, 519 (2d Cir.1990)). A defendant cannot manufacture an imaginary conflict out of thin air where none exists, merely by filing a disciplinary complaint that has no basis. But that abstract proposition does not decide this case, inasmuch as the baselessness of Malede's allegations has not been established. For this very reason, our cases teach that the trial court has "an affirmative 'duty to inquire' ...

whenever 'the *possibility* of a conflict' becomes apparent before or during trial." *Douglas*, 488 A.2d at 136 (quoting *Wood v. Georgia*, 450 U.S. 261, 272, 101 S.Ct. 1097, 67 L.Ed.2d 220 (1981) (emphasis in the original)). Following *Cuyler*, we subsequently recognized that "the 'affirmative duty to inquire' is also applicable to the post-trial period when allegations surface that an alleged conflict of interest had an adverse impact on the attorney's representation." *Thomas*, 685 A.2d at 751. The way to deal with the concern expressed in *Burns* about abusive complaints is not to blink the reality that when a defendant and his lawyer become embroiled in a real dispute over whether the lawyer engaged in wrongdoing, an actual conflict of interest exists. Rather, as the United States Court of Appeals for the Second Circuit explained in *Mathis*, the way to deal with that concern is for the court to determine whether the accusations against the lawyer are frivolous or not:

> The district court recognized that its decision might "cause many appellants to file disciplinary charges against their attorneys," but it correctly observed that "such complaints, if unwarranted or brought with a motivation for delay, should not be grounds for [habeas relief]." ... A frivolous complaint against an attorney, or one filed for purposes of delay, or even one filed for the purpose of obtaining new counsel, would not create a conflict of interest warranting habeas relief of the type approved here.

*Mathis*, 937 F.2d at 796 (citations omitted).

I conclude that, unless Malede's accusations were frivolous, there was an actual

---

tactical defense decisions and refrain from disclosing to appellant any unexpected problem that arose during the course of trial. Appellant, in turn, might be reluctant to question [counsel's] trial decisions for fear of further alienating counsel in the midst of trial."
*Douglas*, 488 A.2d at 136–37 (footnote omitted).

**2.** The majority opinion suggests that it was "[f]or this reason [that] in *Douglas* we pointed

to the fact that Bar Counsel had already begun an investigation into the complaint against counsel at the time the issue arose in court, giving the attorney ten days to respond to the grievances in writing." *Ante* at ——. To the contrary, the commencement of the investigation merely explained how Douglas's counsel learned that his client had filed a grievance against him. *See Douglas*, 488 A.2d at 126.

conflict of interest between him and his counsel. In that event, I also think that, on the record before us, it is demonstrably true that counsel was actively representing conflicting interests—his own and Malede's—and that the actual conflict adversely affected counsel's performance as Malede's lawyer. Counsel actively represented his own interest and performed adversely to Malede when he told the trial court that Malede had made malevolent and false accusations against him. By that unrefuted charge, counsel impugned his client's honesty and integrity to the judge who thereafter would evaluate Malede's credibility and the credibility of his expert witness (who relied in part on what Malede had told him), and who then would impose sentence based on his overall evaluation of the offender standing before him. Malede was entitled to have his lawyer bolster his credibility and character to that judge, not besmirch it.[3]

The majority opinion concedes, as it must, that an adverse effect on counsel's performance is demonstrated if counsel "effectively discredits his client before the factfinder on the defense presented." *Ante* at 273. As the majority states, in such a case "[t]he mischief lies in what counsel did, not in what else he might have done." *Id.* Paradoxically, however, the majority nonetheless goes on to conclude that counsel's disparagement of his client in this case did not manifest an adverse impact on his performance because—so far as the majority can discern, without a hearing, and on the record of trial alone—it had no "*identifiable* effect on the defense strategy [counsel] then followed, the skill or vigor with which he pursued it, or the chances of that defense strategy prevailing." *Ante* at 273 (emphasis added). The fundamental flaw in this reasoning, I respectfully submit, is that it is an analysis not of adverse effect on performance, but of prejudice resulting from counsel's divided loyalty. Under *Cuyler* and *Strickland,*

that is exactly the analysis that a court is *not* to perform once it is determined that an actual conflict of interest adversely affected counsel's performance. "[P]rejudice is presumed when counsel is burdened by an actual conflict of interest," for one reason because "it is difficult to measure the precise effect on the defense of representation corrupted by conflicting interests." *Strickland,* 466 U.S. at 692, 104 S.Ct. 2052; *see also Cuyler,* 446 U.S. at 345–50, 100 S.Ct. 1708.

Without casting any aspersion on Malede's counsel (who may have been unfairly maligned already), the present case may be taken to illustrate the point. Given Malede's accusations against him, counsel's motivation to mount a successful defense was (objectively speaking) counterbalanced by his personal interest in seeing Malede be discredited. Did that interest diminish the diligence and vigor with which counsel pursued Malede's defense? Did an actual conflict explain, for example, why counsel did not manage to find an expert witness whose testimony would support the essentials of Malede's insanity defense? Might unconflicted counsel have negotiated a favorable plea disposition in lieu of trial? The answers to these and similar questions that might be asked are probably unknowable. But they need not be known. Once it is shown that an actual conflict of interest adversely affected counsel's performance, the inquiry into prejudice stops. The essence of the problem is the unacceptable, if often unmeasurable, diminishment in counsel's efforts on his client's behalf.

I conclude that the trial court was required to hold a hearing on Malede's § 23–110 motion to determine whether there was an "actual" conflict of interest—whether, that is, Malede's accusations against his counsel had a foundation in fact or were simply manufactured in bad faith. If the accusations were frivolous, then Ma-

---

**3.** Imagine what we would say if Malede had been tried by a jury instead of a judge, and his counsel had told the jury during voir dire that

he was seeking to withdraw because his client had made malevolently false accusations against him.

lede should be denied relief. If the accusations were not frivolous, there was a sufficient adverse effect on counsel's performance that, under the Sixth Amendment, Malede is entitled to have his convictions vacated, and to receive a new trial with unconflicted counsel.