# District of Columbia
# Court of Appeals

No. 12-CF-1527

CHRISTIAN D. TAYLOR,

Appellant,



v.

**CF1-11826-10**

UNITED STATES,

Appellee.

On Appeal from the Superior Court of the District of Columbia
Criminal Division

BEFORE:  WASHINGTON, *Chief Judge*; FISHER, *Associate Judge*; and NEBEKER, *Senior Judge*.

## J U D G M E N T

This case came to be heard on the transcript of record and the briefs filed, and was argued by counsel.  On consideration whereof, and as set forth in the opinion filed this date, it is now hereby

ORDERED and ADJUDGED that the judgment on appeal is affirmed in part and remanded to the trial court for merger of the robbery convictions in accordance with this opinion.

For the Court:

JULIO A. CASTILLO
Clerk of the Court

Dated:  May 12, 2016.

Opinion by Senior Judge Frank Q. Nebeker.

*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

# DISTRICT OF COLUMBIA COURT OF APPEALS

No. 12-CF-1527

CHRISTIAN D. TAYLOR, APPELLANT,

v.

UNITED STATES, APPELLEE.

FILED 5/12/16
District of Columbia
Court of Appeals

Julio Castillo
Clerk of Court

Appeal from the Superior Court
of the District of Columbia
(CF1-11826-10)

(Hon. Thomas J. Motley, Trial Judge)

(Argued September 15, 2015                    Decided May 12, 2016)

*Nicholas B. Lewis*, with whom *Anand V. Ramana* and *Christopher D. McEachran*, were on the brief, for appellant.

*Anne Y. Park*, Assistant United States Attorney, with whom *Ronald C. Machen Jr.*, United States Attorney at the time the brief was filed, and *Elizabeth Trosman*, *Chrisellen R. Kolb*, *Deborah Sines*, and *Glenn L. Kirschner*, Assistant United States Attorneys, were on the brief, for appellee.

Before WASHINGTON, *Chief Judge*, FISHER, *Associate Judge*, and NEBEKER, *Senior Judge*.

NEBEKER, *Senior Judge*: Appellant Christian D. Taylor appeals his convictions arising from the armed robbery of Lida Wholesale Market, during which the market's owners, Li Jen Chih and Ming Kun Chih, were killed.

Appellant was convicted of two counts of first-degree premeditated murder, four counts of felony murder, burglary two while armed, robbery while armed, and seven counts of possession of a firearm during a crime of violence ("PFCV"). He alleges that the trial court erred when it found him competent to stand trial, declined to appoint him conflict-free counsel, and instructed the jury regarding the offense of felony murder during the course of the burglary. In addition, he contends that the government's evidence was insufficient for the jury to find premeditation and deliberation in order to support his first-degree premeditated murder convictions. We affirm in part, and remand for the trial court to vacate four of the murder convictions, and merge the robbery conviction. Resentencing is unnecessary.

## I.     Facts

On June 23, 2010, at around 3:00 p.m., appellant entered Lida Wholesale Market, located in the Northeast quadrant of the District near the intersection of 5th Street and Florida Avenue. After approaching the counter, appellant demanded, at gunpoint, money from Li Jen Chih, an owner of the market who was operating the cash register at the time. Li Jen Chih initially refused appellant's demand, causing appellant to fire a shot near, but not hitting, Li Jen Chih. After a

scuffle over the gun, Li Jen Chih jumped over the counter to begin physically fighting with appellant.  Additional shots were fired, after which Li Jen fell.  Around that time, Ming Kun Chih, another owner of the store and Li Jen Chih's father, grabbed a pole and rushed at appellant.  Appellant fired at least one additional shot, hitting Ming Kun Chih.

Bystanders outside of the market heard gunshots and saw a man exit the store, tuck a gun into his waistband, run down the street, and enter a silver Pontiac GT with the license plate number CV 3855.  The car was identified as registered to appellant's mother.  Employees inside the store at the time appellant entered testified to the sequence of events at trial, and identified appellant as the gunman.  The events were captured by surveillance cameras, and two witnesses identified appellant as the gunman on the video.  Two plastic bags found in the market near where the confrontations occurred were analyzed by DNA forensic experts.  Appellant was deemed by the expert a major contributor to the DNA mixture on the bags; Li Jen Chih could not be excluded as a possible minor contributor.  Appellant did not present a defense at trial, but argued misidentification to the jury.

## A. Competency

At his arraignment on March 25, 2011, appellant refused to enter a plea, stating that he did not understand the charges against him and was "not able to make a legal determination" regarding whether to plead guilty. The trial court ordered that appellant undergo a twenty-four hour competency screening. However, a few days later, a licensed clinical psychologist at St. Elizabeths Hospital stated that appellant "refus[ed] to fully participate in the evaluation" and accordingly she was unable to form an opinion concerning appellant's competency to stand trial. Appellant was advised to cooperate, and ordered to undergo another screening. However, again, appellant refused to participate, and the assigned psychologist was unable to form an opinion regarding appellant's competency to stand trial.

Following appellant's second refusal to participate in a twenty-four hour competency screening, the trial court ordered that appellant undergo a forty-five day inpatient evaluation at St. Elizabeths Hospital. At the conclusion of his inpatient stay, Drs. Robert Benedetti and Robert Morin concluded that appellant was competent to stand trial. According to the doctors, appellant "correctly identified plea options and knew the consequences associated with each," and

"evidenced an understanding of the roles of . . . the defense and prosecuting attorneys, the judge, and the witnesses." Appellant evinced "no evidence of delusional beliefs, paranoid ideation, or other psychotic or cognitive processes that impeded his ability to rationally understand his charges and the court proceedings." Appellant was diagnosed with Antisocial Personality Disorder, but no treatment or medications were required. On June 1, 2011, the trial court concluded that appellant was competent to stand trial over appellant's defense counsels' objections as to the nature of the test.[1]

Six months later, and approximately three weeks prior to the scheduled trial date, appellant presented with symptoms of an illness: his eyes were closed, his head was bobbing, he was non-responsive, and later claimed to be unable to hear or talk. Communicating with the trial court via written notes, appellant claimed that "[his] senses have been impaired by a higher power . . . . They are on and off at times." The trial court noted several indicators that appellant could hear the proceedings taking place around him, including that appellant had seemed to respond to a conversation. The trial court noted its concern that appellant was

---

[1] Defense counsel and appellant reported that appellant's examiners provided him with the answers to the test before the test began, and that they told him to "guess again" until he arrived at the "correct" answer.

merely attempting to delay the proceedings, but went on to approve a request for medical screening.

Several weeks of unproductive hearings followed, in which appellant continued to claim an inability to speak or hear (despite observations from the trial court, medical examiners, and detention officers to the contrary). Appellant refused to cooperate with examiners during a court-ordered medical examination and two court-ordered twenty-four hour competency screenings. The medical examination revealed no medical basis for his symptoms.[2] After each competency screening, the examiners found no indication that appellant's symptoms were the result of mental illness, and instead concluded that they were "volitional."[3]

---

[2] The psychiatrist at the jail did diagnose appellant with psychotic disorder not otherwise specified and started appellant on medication. However, it was not suggested that the disorder caused his symptoms.

[3] Following the first screening, the assigned psychologist concluded that it was "most likely" that appellant's "presentation resulted from volitional characterological traits," "given the sudden onset of his symptoms, no prior history of severe mental illness, absence of acute distress, reports from correctional officers contradicting his self-report of symptoms, and his previous diagnosis of Antisocial Personality Disorder."

After the second screening, the examiner concluded that appellant's "presentation and reported symptoms [we]re not typical of people who are mentally ill and [we]re suggestive of malingering."

Nonetheless, at the examiner's suggestion, appellant was ordered to undergo another forty-five day inpatient examination at St. Elizabeths. A report prepared by Dr. Michele Godwin at the close of appellant's examination concluded that appellant's "selective mutism appear[ed] to be under volitional control" due to his ability to speak with peers and on the telephone, and his "high frequency of odd, bizarre, or illogical items across scales [on a screening test for the detection of malingering] suggest[ed] an attempt to appear highly disturbed." As a result, the psychologists concluded that his "symptoms" were not indicative of mental illness, but rather "a deliberate effort on [his] part to delay or avoid trial." Appellant was diagnosed with "Malingering (Psychosis)."

The trial court held hearings on appellant's competency on April 20 and 25, 2012, and defense counsel was provided an opportunity to cross examine Dr. Godwin. During her testimony, and in support of her finding that appellant was competent to stand trial, Dr. Godwin noted: "In the courtroom right now Mr. Taylor is writing messages to his attorney, Mr. Harris [his attorney] is taking breaks to talk to Mr. Taylor. He's paying attention. He's tracking from my understanding of observing him right now." The trial court ultimately found appellant competent to stand trial.

## B.     Conflicts with Counsel

Appellant evinced difficulty working with his appointed attorneys throughout the proceedings before the trial court.   Mr. Geoffrey Harris was appointed to represent appellant on October 7, 2011, as "co-counsel" with appellant's counsel at that time, Mr. Atiq Ahmed.  Earlier, on June 1, 2011, Mr. Ahmed had moved to withdraw on the basis that appellant questioned his ability to represent him.   The motion was denied, but their differences continued to be evident at the October hearing.  The court appointed Mr. Harris to "assist" Mr. Ahmed, given appellant's uncooperativeness, and to ensure the originally-scheduled trial date, in January 2012, continued as scheduled.

On January 5, 2012, Mr. Harris filed a motion to withdraw, stating that he had received notice that appellant filed a complaint against him with the Office of Bar Counsel.  At the next hearing, appellant claimed an inability to hear or talk, as discussed *supra*.  However, Mr. Harris's motion was briefly discussed, and the trial court indicated it would address Mr. Harris's motion to withdraw after the competency issue had been resolved.   The court permitted Mr. Ahmed to withdraw, based on appellant's bias against Mr. Ahmed's religion, on January 27, 2012.

The court addressed the motion to withdraw filed by Mr. Harris—who was at this point appellant's sole counsel—at a competency hearing. At the hearing, Mr. Harris asked the trial court to recuse itself so that he could speak freely about his alleged conflict without prejudicing appellant. The trial court again indicated that it would address both the conflict of interest and recusal issues after resolving appellant's competency.

After finding appellant competent to stand trial on April 25, 2012, the trial court turned to Mr. Harris's pending motions for recusal and to withdraw as counsel. The trial court noted that appellant would be tried by a jury, rather than in a bench trial. Accordingly, as the court was most familiar with the case, it would not recuse itself at that point and would hear Mr. Harris's motion.[4] In an ex parte hearing on April 30, 2012, Mr. Harris indicated appellant's concern about Mr. Harris's perceived lack of experience,[5] that appellant had threatened to bring a

---

[4] The government stated its opposition to Mr. Harris's motion to withdraw prior to the ex parte hearing.

[5] Mr. Harris had been appointed to represent approximately six juveniles in murder cases, two adults in murder cases, and had represented defendants in approximately thirty or forty felony jury trials. However, none of his murder cases had been tried before a jury.

malpractice suit against him,[6] and referenced appellant's complaint to the Office of Bar Counsel, which he presumed to be premised in part on their differences over how to proceed with the case. After hearing Mr. Harris's concerns, the trial court denied Mr. Harris's motion to withdraw. The court concluded that Mr. Harris was competent to handle the issues at hand, and that appellant's threats of malpractice suits did not disqualify Mr. Harris, as appellant "would make [those threats] against any counsel who represents him. As far as my understanding, those are the same types of threats he made with regard to Mr. Ahmed in this situation." Ultimately, the court indicated its underlying concern: even were the court to replace Mr. Harris, appellant would not cooperate with any future attorney, nor would appellant be satisfied with the experience level of any future attorney. Accordingly, the court concluded that no genuine conflict of interest existed that required Mr. Harris's withdrawal:

> Mr. Taylor in this situation is manipulating it to his own ends and the Court needs to protect against such

[6] Mr. Harris represented that appellant first made "vague ambiguous threats" against him in December 2011. During the time that Mr. Harris's withdrawal motion remained pending, he "continue[d] to receive the threats against [him] and … [his] family, promises of malpractice suits." However, at that time, Mr. Harris seemed concerned not about physical violence, but rather "a potential malpractice suit and the money and time that would take to resolve that regardless of the legitimacy of the complaint."

> manipulation in its decision whether to grant the relief you seek or not. That he, by his conduct, has and is creating a conflict resulting from his own decision to avoid going to trial. In essence, by him creating that it doesn't create a real [conflict], to the extent it does, it's one that he has presented.

Nonetheless, the trial court did indicate that it would appoint a co-counsel to Mr. Harris to assist him with the case. The following day, the court appointed Mr. Craig Moore as co-counsel to Mr. Harris.

Mr. Harris renewed his motion to withdraw approximately one month later on the basis that while Mr. Moore's appointment was helpful it did not address the underlying conflict of interest. Mr. Harris also noted two additional grounds for his motion: that appellant wanted to call him as a witness in the defense case, and that appellant continued to be dissatisfied with the frequency of Mr. Harris's visits. The trial court again denied the motion, reiterating its belief that appellant would manufacture a conflict with any attorney appointed to represent him.

On June 4, 2012, one week prior to trial, appellant filed a motion requesting that the court recuse itself. Appellant argued that the nature of the information disclosed in the April 30 ex parte hearing would cause an objective observer to doubt whether the court could remain impartial. Additionally, on June 11, 2012—

the morning that voir dire was scheduled to begin—Mr. Harris notified the court that appellant wished to proceed pro se, and requested a continuance in order to prepare himself to do so.[7] The trial court denied appellant's motion for recusal, for a continuance, and to represent himself pro se.

Shortly thereafter, after the jury was sworn, Mr. Harris renewed his motion to withdraw on the basis that appellant had threatened Mr. Harris's children. The trial court denied the motion, and, at the bench, warned appellant that he was moving forward with trial despite appellant's attempts to delay. Trial began the following day.

## II.    Competency

"Constitutional due process requires that a criminal defendant be mentally competent for a trial to proceed." *Higgenbottom v. United States*, 923 A.2d 891, 897 (D.C. 2007) (citing *Medina v. California*, 505 U.S. 437, 439 (1992)). A defendant is presumed competent, and it is the burden of the party asserting the

---

[7] Appellant also requested a continuance to secure additional witnesses, and notified the court of his plan to call Mr. Harris and the United States to the witness stand.

defendant's incompetence to so prove by the preponderance of the evidence. *Hargraves v. United States*, 62 A.3d 107, 111 & n.9 (D.C. 2013) (citing D.C. Code § 24-531.04 (b) (2012 Repl.); *Medina*, *supra*, 505 U.S. at 451-53). To evaluate a defendant's competence, the trial court looks to whether the defendant "has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding," and "has a rational as well as factual understanding of the proceedings against him." *Dusky v. United States*, 362 U.S. 402, 402 (1960); *accord* D.C. Code § 24-531.01(1); *Phenis v. United States*, 909 A.2d 138, 152 (D.C. 2006). A determination of competency is committed to the trial court's discretion, and we will not overturn it unless it is "clearly arbitrary or erroneous." *Bennett v. United States*, 400 A.2d 322, 325 (D.C. 1979) (quoting *United States v. Caldwell*, 543 F.2d 1333, 1359 (D.C. Cir. 1974)).

Appellant contends that the trial court abused its discretion in deeming him competent to stand trial. We disagree. The trial court's finding of competency was well-supported by the record. The appellant had no prior history of mental illness. Appellant was deemed competent by two separate mental health professionals at St. Elizabeths Hospital. During the competency hearings, Dr. Godwin testified that appellant was competent, suffered from no mental illness, and was feigning his symptoms. Officer Michael Wilkerson, and U.S. Deputy

Marshal Shindledecker also testified to information supportive of a finding that appellant was feigning his illness in an attempt to delay trial. The trial judge's personal observations of appellant in the courtroom—in which he noted that appellant appeared to consult with counsel, strain to listen to conversations at the bench, and understand what was happening in the courtroom—supported his competency findings. Moreover, it was appellant's burden to overcome the presumption that he was competent to stand trial. He presented no evidence to overcome that presumption. Accordingly, the trial judge did not clearly err in finding that appellant was competent to stand trial.

## III. Counsel's Alleged Conflict of Interest

Appellant contends that an actual conflict of interest existed between himself and Mr. Harris, which adversely affected Mr. Harris's performance. Appellant further contends that the trial court erred in failing to recuse itself after declining to permit Mr. Harris to withdraw based on a conflict of interest. Appellant contends both of these errors require reversal of his convictions; we address each in turn.

The Sixth Amendment guarantees the right to effective assistance of counsel. *Freeman v. United States*, 971 A.2d 188, 194 (D.C. 2009). "The first

element of effective assistance of counsel is counsel's ability and willingness to advocate fearlessly on behalf of his client." *Id.* (quoting *Douglas v. United States*, 488 A.2d 121, 135 (D.C. 1985)). The trial court has a duty to inquire into any potential conflict of interest that comes to its attention before or during trial. *See Douglas*, *supra*, 488 A.2d at 136. If the inquiry "reveals [that] an actual conflict of interest exists, and the defendant objects to continued representation by the conflict-burdened attorney, new counsel must be appointed." *Id.* In this case, the court did inquire, and appellant did object to continued representation by Mr. Harris so our initial inquiry is focused on whether an actual conflict existed at all. However, "a conflict alone is not enough to permit reversal of a conviction on appeal," unless the conflict can "be shown to have adversely affected the trial attorney's performance." *Malede v. United States*, 767 A.2d 267, 272 (D.C. 2001) (quoting *Strickland v. Washington*, 466 U.S. 668, 692 (1984)).

Appellant argues that there was an actual conflict of interest between himself and Mr. Harris because of the bar complaint filed and alleged threats made by appellant against counsel and his family. The mere filing of a bar complaint does not always create an actual conflict of interest. *See Malede*, *supra*, 767 A.2d at 272. However, appellant relies on *Douglas* in which, upon inquiry by the court, the trial judge explicitly found that a bar complaint lodged by the defendant against

counsel did create an actual conflict that would adversely affect counsel's ability to provide effective assistance at trial. *See Douglas*, *supra*, 488 A.2d at 137. Accordingly, trial counsel was allowed to withdraw. *Id.* In reviewing *Douglas*, this court said, after finding there was an actual conflict that would adversely affect counsel's representation at trial, "had [the trial court] simply ignored Bar Counsel's investigation and allowed the trial to continue with [the same attorney] representing appellant, it is reasonable to conclude that any conviction obtained as a result would have been vulnerable if appealed on Sixth Amendment grounds." *Id*. Even so, *Douglas* does not preclude what happened here. Here, the court did appropriately inquire into the potential conflict, explicitly found that there was no actual conflict, but rather that appellant was purposely manipulating the court in order to prevent going to trial, and then appointed co-counsel to assist Mr. Harris. The court's remedy of appointing Mr. Moore as co-counsel for trial was sufficient to prevent any potential prejudice to appellant. The record shows that, in practicality, Mr. Moore acted as lead counsel during trial, while Mr. Harris took a back seat. Appellant has not complained about Mr. Moore's performance and the appellant fails to direct us to any prejudice suffered as a result of Mr. Harris' continued representation. We agree with the trial court that appellant was malingering and that his attempt to manufacture a conflict of interest with his attorney was merely another effort to manipulate the court and avoid trial.

Appellant further argues that the trial court erred in declining to recuse itself from presiding over the trial when it did not recuse itself from the hearing on Mr. Harris' motion to withdraw. Appellant maintains that in hearing the motion to withdraw, the court exposed itself to statements prejudicial to appellant which could have affected its neutrality during the remainder of the proceedings.

Rule 2.11(A) of the Code of Judicial Conduct for the District of Columbia Courts provides that, "a judge shall recuse himself or herself in any proceeding in which the judge's impartiality might reasonably be questioned." Appellant relies on a footnote in *Witherspoon* which directs, "[i]n order to avoid the prejudice to appellant which could arise when defense counsel explains the ethical considerations which underlie his motion to withdraw, the judge who presides at appellant's trial should be different from the judge who conducts the conflict inquiry." *Witherspoon v. United States*, 557 A.2d 587, 591 n.2 (D.C. 1989). We view this footnote as perhaps a rule of prudence, but not an inexorable command. Here, the motion to withdraw had seemingly become as important as the trial itself. Judge Motley was in the best position to hear such a motion because he had been privy to the complex and tumultuous relationship between counsel and appellant, as well as appellant's relationships with his previous lawyers. While in some cases, judicial efficiency may counsel in favor of recusal from hearing a potentially

prejudicial pretrial motion (as was the case in *Witherspoon*) in other cases judicial efficiency may counsel in favor of hearing the pretrial motion, and recusing oneself from the subsequent trial if need be. Judge Motley explicitly noted that if he had been prejudiced after the hearing on the motion to withdraw, he would recuse himself from the trial. It is clear that Judge Motley was well aware of his duty to recuse himself if his impartiality might reasonably be questioned, but determined that it was not necessary and no resulting bias appears in the record.[8] We see no reason to doubt Judge Motley's finding that there was no "basis to believe that [his] ability to conduct [the] trial in a fair and impartial manner [was] compromised."

## IV.   Evidence Supporting First-Degree Premeditated Murder Conviction

Appellant contends that the government presented insufficient evidence that the murders were premeditated and deliberate, and accordingly those convictions should be reversed. Because only one murder conviction per victim can stand, and

---

[8] Trial judges are presumed to be impartial; they are routinely exposed to potentially prejudicial—even damning—information about defendants. As gatekeepers, trial judges are often privy to an abundance of information, such as prior criminal convictions, confessions, inflammatory statements, and gruesome evidence, that is deemed too prejudicial for the jury to hear, yet we still trust that the judge will conduct the trial impartially.

because the sentence will remain the same no matter which murder convictions are vacated as merged,[9] we decline to reach the question of premeditation. We will vacate the first-degree premeditated murder convictions and uphold only the two felony murder convictions predicated on robbery.[10]

## V.    Merger

The Double Jeopardy Clause of the Fifth Amendment prohibits "multiple punishments for the same offense." *Lennon v. United States*, 736 A.2d 208, 209 (D.C. 1999). It "compels merger of duplicative convictions for the same offense, so as to leave only a single sentence for that single offense." *McCoy v. United*

---

[9] The court imposed the same forty-year sentence for each murder conviction with the sentences for each of the other convictions within each group running concurrently with the forty-year murder sentence. As long as one murder conviction per victim is upheld, the sentence will remain the same. Here we will uphold the two felony murder convictions predicated on robbery.

[10] Appellant contends, and the government agrees, that the court erred in its felony murder predicated on second-degree burglary jury instruction. Appellant argues that this court could not find the error harmless and must vacate those felony murder convictions. The government's counter (that the error was harmless) rested on the fact that the jury was separately, properly instructed on the first-degree premeditated murder counts, and that because the jury convicted on those counts, it followed that it necessarily found the requisite intent to kill required under the felony murder statute. However, because we now vacate the premeditated murder convictions, we will not find the error harmless. We will vacate the felony murder convictions predicated on second-degree burglary as well.

*States*, 890 A.2d 204, 216 (D.C. 2006). The government agrees that some of appellant's convictions merge and that remand is necessary for vacation of two of the three murder charges relating to each victim. However, the government does not agree with appellant that his PFCV convictions should merge into one.

In general, "when the convictions for the predicate crimes do not merge [] the associated PFCV convictions do not merge either." *Matthews v. United States*, 892 A.2d 1100, 1106 (D.C. 2006) (quoting *Stevenson v. United States*, 760 A.2d 1034, 1035 (D.C. 2000)). We recognize a limited exception to this general rule that multiple PFCV convictions will merge, even if the predicate felony offenses do not merge, if they arise out of a defendant's uninterrupted possession of a single weapon during a single act of violence." *Matthews*, *supra*, 892 A.2d at 1106 (citing *Nixon v. United States*, 730 A.2d 145, 153 (D.C. 1999)). The appellant urges the court to see his acts as one continuous act of violence as it did in *Nixon*. The government contends that these are distinct acts and each subject to its own PFCV conviction.

This court has adopted the "'fresh impulse" or "fork-in-the-road" test: If at the scene of the crime the defendant can be said to have realized that he has come to a fork in the road, and nevertheless decides to invade a different interest, then

his successive intentions make him subject to cumulative punishment. . . ."
*Matthews*, *supra*, 892 A.2d at 1106 (quoting *Stevenson*, *supra*, 760 A.2d at 1037).
The rationale of the rule is that "[e]ach time the defendant commits an independent
violent crime, a separate decision is made whether or not to possess the firearm
during that crime, thereby exposing the defendant to a separate, additional
conviction of PFCV." *Id.* Applying the fresh impulse test, we find that appellant
committed multiple, distinct acts of violence, namely second-degree burglary,
armed robbery, and two first-degree murders. After the commission of each of
those crimes, he acted on a fresh impulse to commit another; this is not in accord
with *Nixon*. Each of the violent crimes supports its own PFCV conviction.

We vacate both first-degree premeditated murder convictions, and both
felony murder convictions predicated on second-degree burglary. Because we
vacate the felony murder convictions predicated on second-degree burglary, the
second-degree burglary convictions can stand on their own.[11] We uphold the
felony murder convictions predicated on robbery so we must merge the predicate
robbery conviction. For sentencing, the trial court divided the convictions into two
groups, one group for those relating to each of the murder victims. It applied the

---

[11] Had we upheld those felony murder convictions the burglary convictions
would merge into the murders.

same forty-year sentence for each murder conviction with the sentences for each of the other convictions within each group running concurrently with the forty-year murder sentence. Therefore, even though remand is necessary to merge the robbery convictions, resentencing is unnecessary.

## VI. Conclusion

Accordingly, the judgment in this appeal is therefore affirmed in part and remanded to the trial court for merger of the robbery convictions in accordance with this opinion.

*So ordered.*